UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 21 CR 445 |
| v. | |
| NICOLAS CALVILLO-DIAZ | Hon. John J. Tharp, Jr. |

**GOVERNMENT RESPONSE TO DEFENDANT NICOLAS CALVILLO-DIAZ'S MOTION TO DISMISS**

The United States of America, by its attorney John R. Lausch, Jr., United States Attorney for the Northern District of Illinois, submits this response to Defendant Nicolas Calvillo-Diaz's Motion to Dismiss (R. 27) (the "Motion").

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney
Northern District of Illinois

By: */s/ Patrick M. Mott*
Patrick M. Mott
Assistant United States Attorneys
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 554-9133

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... i

INTRODUCTION ........................................................................................ 1

FACTUAL BACKGROUND ......................................................................... 2

STATUTORY BACKGROUND .................................................................... 3

ARGUMENT ............................................................................................... 5

    I.   Section 1326 Is Constitutional Under Rational Basis Review, the Standard Applicable to an Equal-Protection Challenge to a Law that Regulates the Removal of Noncitizens ........................................................................................... 9

        A.   The Rational Basis Standard Applies ................................................ 9

        B.   Section 1326 Is Constitutional Under Rational Basis Review ................. 14

    II.   Section 1326 Does Not Violate Equal Protection Under the *Arlington Heights* Standard ................................................................................................... 15

        A. Legal Framework .......................................................................... 16

        B. The Lack of Congressional Debate Regarding Section 1326 Does Not Support an Inference of Discriminatory Intent .................................................... 19

        C.   Statements by the INA's Opponents Do Not Support an Inference of Discriminatory Intent ...................................................................... 21

        D.   Defendant Mischaracterizes the Ford Letter and Anti-Harboring Legislation ...................................................................................... 23

        E.   Section 1326's Impact on Latinx Defendants Does Not Give Rise to an Inference of Discriminatory Intent ..................................................... 25

        F.   Illegal Reentry Would Have Been Criminalized Irrespective Of Any Animus That Members of Congress Allegedly Harbored 93 Years Ago........................ 29

    III.   No Evidentiary Hearing Is Warranted ......................................... 31

CONCLUSION................................................................................... 33

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) ....................................................... 8

*Arizona v. United States*, 567 U.S. 387 (2012)........................................... 12

*Brnovich v. DNC*, 141 S. Ct. 2321 (2021)................................................... 23

*Canto v. Holder*, 593 F.3d 638 (7th Cir. 2010)........................................... 15

*City of Chicago v. Shalala*, 189 F.3d 598 (7th Cir. 1999).............. 13, 14, 18

*City of Mobile v. Bolden*, 446 U.S. 55 (1980)................................... 8, 22, 23

*Conley v. United States*, 5 F. 4th 781 (7th Cir. 2021)................................. 35

*Cook County v. Wolf*, 461 F. Supp. 3d 779 (N.D. Ill. 2020) ................. 15, 16

*Dept't of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020) ...................................................................................... 23, 33

*Fiallo v. Bell*, 430 U.S. 787 (1977)........................................... 13, 14, 16

*Graham v. Richardson*, 403 U.S. 365 (1971) ............................................. 12

*Heller v. Doe*, 509 U.S. 312 (1993).................................................... 13, 39

*Hernandez v. Mesa*, 140 S. Ct. 735 (2020) ................................................ 11

*Hudson v. United States*, 522 U.S. 93 (1997).............................................. 18

*Hunter v. Underwood*, 471 U.S. 222 (1985) .............................................. 22

*Johnson v. Governor of State of Florida*, 405 F.3d 1214 (11th Cir. 2005) ........... 25, 26

*Johnson v. Kirkland*, 290 F.2d 440 (5th Cir. 1961)................................... 30

*Kimbrough v. United States*, 552 U.S. 85 (2007)....................................... 25

*Klementanovsky v. Gonzales*, 501 F.3d 788 (7th Cir. 2007) ..................... 15

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) .......... 40

*Ledezma-Cosino v. Sessions*, 857 F.3d 1042 (9th Cir. 2017) ..................... 17

*Lopez-Ramos v. Barr*, 942 F.3d 376 (7th Cir. 2019) .................................. 15

*Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020).............................................. 22

*Mathews v. Diaz*, 426 U.S. 67 (1976) ........................................ 11, 12, 13

*McCleskey v. Kemp*, 481 U.S. 279 (1987) ............................................ 23, 39

*Pena-Cabanillas v. United States*, 394 F.2d 785 (9th Cir. 1968)......... 16, 37

*Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633 (1990).............. 40

*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979)................. 8, 21, 22, 34

i

*Reno v. Flores*, 507 U.S. 292 (1993) ............................................................................ 14

*Robledo v. Ashcroft*, 342 F.3d 667 (7th Cir. 2003) ................................................. 14, 18

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018) .............................................................. 12, 14

*United States v. Amador-Bonilla*, No. CR-21-187, 2021 WL 5349103 (W.D. Okla. Nov. 16, 2021) ................................................................................................................. 9, 19

*United States v. Arenas-Ortiz*, 339 F.3d 1066 (9th Cir. 2003) .................................. 34

*United States v. Carlos-Colmenares*, 253 F.3d 276 (7th Cir. 2001) .............. 16, 17, 19

*United States v. Coleman*, 24 F.3d 37 (9th Cir. 1994) ............................................... 35

*United States v. Corrales-Beltran*, 192 F.3d 1311 (9th Cir. 1999) ........................... 26

*United States v. Dumas*, 64 F.3d 1427 (9th Cir. 1995) .............................................. 35

*United States v. Gutierrez-Barba*, No. CR-19-01224-001-PHX-DJH, 2021 WL 2138801 (D. Ariz. May 25, 2021) ........................................................................................... 10

*United States v. Hernandez-Guerrero*, 147 F.3d 1075 (9th Cir. 1998) ................ 16, 19

*United States v. Hernandez-Lopez*, No. H-21-440, 2022 WL 313774 (S.D. Tex. Feb. 2, 2022) .......................................................................................................................... 9

*United States v. Johnson*, 40 F.3d 436 (D.C. Cir. 1994) ...................................... 35, 36

*United States v. Machic-Xiap*, No. 3:19-cr-407-SI, 2021 WL 3362738 (D. Or. Aug. 2, 2021) ............................................................................................................. 10, 28, 29

*United States v. Maurico-Morales*, No. CR-21-298, 2022 WL 99996 (W.D. Okla. Jan. 10, 2022) .................................................................................................................. 9, 19

*United States v. Medina Zepeda*, No. CR 20-0057 FMO, 2021 WL 4998418 (C.D. Cal. Jan. 5, 2021) ........................................................................................................... 10

*United States v. Montenegro*, 231 F.3d 389 (2000) .................................................. 15

*United States v. Munoz-De la O*, No. 2:20-CR-134-RMP-1, 2022 WL 508892 (E.D. Wash. Feb. 18, 2022) ................................................................................................. 9

*United States v. Novondo-Ceballos*, No. 21-CR-383 RB, 2021 WL 3570229 (D. N.M. Aug. 12, 2021) ...................................................................................................... 10, 19

*United States v. O'Brien*, 391 U.S. 367 (1968) ......................................................... 22

*United States v. Ponce-Galvan*, No. 21-cr-2227-H-1, 2022 WL 484990 (S.D. Cal. Feb. 16, 2022) .................................................................................................................... 9

*United States v. Rivera-Sereno*, No. 21-cr-129, 2021 WL 5630728 (S.D. Ohio Dec. 1, 2021) ...................................................................................................................... 9, 19

*United States v. Samuels-Baldayaquez*, No. 4:20 CR 83, 2021 WL 5166488 (N.D. Ohio Nov. 5, 2021) ......................................................................................................... 9, 19, 28

*United States v. Sanchez-Felix*, No. 21-cr-00310-PAB, 2021 WL 6125407 (D. Colo. Dec. 28, 2021) .................................................................................. 9, 30

*United States v. Sifuentes-Felix*, No. 21-cr-337-WJM, 2022 WL 293228 (D. Colo. Feb. 1, 2022) .............................................................................................. 9

*United States v. Sugden*, 226 F.2d 281 (9th Cir. 1955) .............................................. 30

*United States v. Suquilanda*, No. 21 CR 263, 2021 WL 4895956 (S.D.N.Y. Oct. 20, 2021) .................................................................................................. 10, 38

*United States v. Wence*, No. 3:20-CR-0027, 2021 WL 2463567 (D. V.I. June 16, 2021) ................................................................................................................ 10

*Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977) .......................................................................................................... passim

*Washington v. Davis*, 426 U.S. 229 (1976) ................................................................ 20

*Wayte v. United States*, 470 U.S. 598 (1985) ...................................................... 11, 34

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ................................................................. 11

*Zuber v. Allen*, 396 U.S. 168 (1969) ........................................................................ 25


## STATUTES

Act of Mar. 4, 1929, Pub. L. No. 70-1018 ................................................................... 4

Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 .............................................................................................................. 5

Immigration Act of 1917, Pub. L. No. 64-301, 39 Stat. 874, 889 ............................... 4

Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 ................................. 5

Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009 .............................................................................................................. 6

Pub. L. No. 100-690, 102 Stat. 4181 .......................................................................... 5

Pub. L. No. 82-283, 66 Stat. 26 (1952) ..................................................................... 31

Pub. L. No. 82-414, 66 Stat. 163 ...................................................................... 4, 5, 27

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 .................................................................................................... 5


## LEGISLATIVE HISTORY

98 Cong. Rec. 2141-2143 (Mar. 12, 1952) ............................................................... 29

iii

98 Cong. Rec. 5169 (1952) ........................................................................... 29

S. 2842, 82d Cong., 2d Sess. (Mar. 12, 1952) ............................................. 29

S. 716, 82nd Cong., 1st Sess. (Jan. 29, 1951) ............................................. 30

S. Rep. No. 70-1456 (Jan. 17, 1929) ..................................................... 4, 19

S. Rep. No. 81-1515 (1950) .......................................................... 27, 37, 38

CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V ................................................................................. 11

**INTRODUCTION**

Defendant Nicolas Calvillo-Diaz moves to dismiss the indictment in this case on the grounds that 8 U.S.C. § 1326, punishing illegal reentry of deported aliens, violates the Equal Protection Clause of the Fifth Amendment by discriminating against Mexican and Latinx individuals. The Court should deny the Motion.

Defendant's primary argument is that Congress's enactment of a predecessor statute criminalizing illegal reentry in 1929 was "tainted" by discriminatory motives, and that this original discriminatory intent renders unconstitutional any subsequent congressional immigration legislation, up to and including the present-day version of 8 U.S.C. § 1326, first enacted in 1952 and amended multiple times since. Defendant's argument fails because it ignores Congress's plenary power to enact exactly this type of immigration legislation, as well as the obvious and rational bases for the statute. It likewise rests on the flawed premise, foreclosed by the Supreme Court, that discriminatory motives of certain congressmen (even assuming that they existed) may be imputed not just to their congressional contemporaries, but to entire subsequent bodies of Congress who made its own legislative judgments and policy determinations.

The meager evidence defendant offers that actually relates to congressional actions in 1952 relates generally to the passage of the Immigration and Naturalization Act of 1952 (the "INA"), a comprehensive revision of U.S. immigration law, and bears no specific relationship to the enactment of Section 1326. No new evidence or new arguments in defendant's Motion distinguish it from over a dozen

1

similar motions that have been denied in districts across the country. Defendant relies exclusively on a single outlier decision from the District of Nevada, *United States v. Carrillo-Lopez*, No. 3:20-cr-00026-MMD-WGC (D. Nev. Aug. 18, 2021) (R. 19, Ex. A), currently on appeal in the Ninth Circuit. Like Defendant's Motion, however, the *Carrillo-Lopez* decision impermissibly imputed discriminatory intent based on congressional silence, failed to diagnose any relevant disparate impact, incorrectly applied heightened scrutiny to immigration legislation, and, even in doing so, failed to properly apply the Supreme Court's framework. Accordingly, the Motion should be denied, just as every district court decision issued since *Carrillo-Lopez* has declined to adopt its reasoning.

## FACTUAL BACKGROUND

Defendant Nicolas Calvillo-Diaz is a citizen of Mexico. R. 1, ¶ 4. He has been removed from the United States on two prior occasions and has previously been convicted of violating 8 U.S.C. § 1326. R. 1, ¶¶ 6, 9; Dkt. No. 27, *United States v. Calvillo*, No. 3:10-cr-00216-BTM-1 (S.D. Cal. Aug. 31, 2010) (judgment entered). Prior to his first removal in 1998, defendant sustained convictions for armed robbery and unlawful weapon possession. R. 1, ¶ 5. Following that removal, at a time unknown, defendant reentered the United States. *Id*. at ¶ 8. In November 2009, defendant was charged in Cook County, Illinois with aggravated discharge of a firearm. *Id*. at ¶ 7. Within approximately one month of that incident, defendant left the United States and was arrested and charged with violating 8 U.S.C. § 1326 as he attempted to reenter the United States from Mexico using an alias in December 2009. Dkt. No. 1,

*United States v. Calvillo*, No. 3:10-cr-00216-BTM-1 (S.D. Cal. Dec. 28, 2009) (complaint filed). After being convicted of illegal reentry and serving a 21-month federal sentence, defendant was convicted on the aggravated discharge of a firearm charge associated with the November 2009 shooting in Cook County and sentenced to six years of imprisonment. R. 1, ¶ 7. Defendant was then removed from the United States for a second time in October 2016. *Id*. at ¶ 9. Following that removal, at a time unknown, defendant reentered the United States yet again. *Id*. at ¶¶ 10-11.

On July 16, 2021, members of the Immigration Customs Enforcement ("ICE"), Enforcement Removal Operations ("ERO") Chicago Mobile Criminal Apprehension Team ("MCAT") found defendant in Chicago, Illinois and placed him in ICE custody pending his removal to Mexico. *Id*. at ¶ 11. Defendant was charged by complaint on July 19, 2021. *Id*. On August 17, 2021, as a result of defendant being "present and found in" Chicago, the grand jury returned an indictment charging defendant with one count of illegal reentry, in violation of 8 U.S.C. § 1326(a) and 6 U.S.C. § 202(4). R. 7. As cited on the face of the indictment, because defendant's prior removals followed convictions for commissions of aggravated felonies, his maximum term of imprisonment upon conviction is twenty years pursuant to 8 U.S.C. § 1326(b)(2). R. 7. On January 14, 2022, defendant moved to dismiss the indictment (R. 19), and the government now responds.

**STATUTORY BACKGROUND**

In the Immigration Act of 1917, Congress passed legislation requiring deportation of aliens who entered the United States "at any time or place other than

3

as designated by immigration officials, . . . or who enter[ed] without inspection."
Immigration Act of 1917, Pub. L. No. 64-301, § 19, 39 Stat. 874, 889. The Immigration
Act of 1917 imposed no penalty for reentering after deportation, other than repeated
deportation. In 1929, to enhance the deterrent value of the deportation laws,
Congress made "enter[ing] or attempt[ing] to enter" the United States after a
deportation a felony offense punishable by up to two years' imprisonment. *See* Act of
Mar. 4, 1929, Pub. L. No. 70-1018. The Senate Report from the Committee on
Immigration outlined the purpose of the law:

> Except [for "members of the anarchistic and similar classes"] . . . there is no
> provision of law under which a penalty, other than repeated deportation, can
> be imposed on aliens who have been expelled from the United States and who
> reenter the country unlawfully. It frequently happens that aliens of the
> criminal and other classes who are deported under the general immigration
> law reenter the country unlawfully. As a matter of fact, in some instances such
> aliens have been deported four or five times, only to return as soon as possible
> to the United States in an unlawful manner.

S. Rep. No. 70-1456, at 1 (Jan. 17, 1929).

More than two decades later, in 1952, Congress passed the Immigration and
Nationality Act ("INA"), an act designed to "revise the laws relating to immigration,
naturalization, and nationality" in the United States. *See* Pub. L. No. 82-414, 66 Stat.
163 (introduction). In this comprehensive legislation (codified at 8 U.S.C. § 1 et seq.),
Congress revised the crime of illegal reentry. The text stated:

> Any alien who (1) has been arrested and deported or excluded and deported,
> and thereafter (2) enters, attempts to enter, or is at any time found in, the
> United States, unless (A) prior to his reembarkation at a place outside the
> United States or his application for admission from foreign contiguous
> territory, the Attorney General has expressly consented to such alien's
> reapplying for admission; or (B) with respect to an alien previously excluded
> and deported, unless such alien shall establish that he was not required to

4

obtain such advance consent under this or any prior Act, shall be guilty of a felony[.]

*Id.* at § 276, 66 Stat. 229 (8 U.S.C. § 1326).

Congress has since altered Section 1326 on multiple occasions, increasing its deterrent value each time. In the Anti-Drug Abuse Act of 1988, the 100th Congress added subsection (b) to Section 1326, creating enhanced penalties for aliens, such as defendant, with prior felony convictions. *See* Pub. L. No. 100-690, § 7345, 102 Stat. 4181. Other modifications occurred in the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (increasing the fine provision); the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (increasing penalties); the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (among other things, limiting collateral attacks on deportation orders in § 1326 prosecutions); and the Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009 (among other modifications, striking "arrested and deported, has been excluded and deported," and inserting "denied admission, excluded, deported, or removed").

## ARGUMENT

The Court should deny defendant's motion to dismiss without an evidentiary hearing for two reasons. First, immigration laws are subject to a highly deferential standard of review, and the defendant does not even begin to overcome that standard. Section 1326 bears an obvious rational relationship to the government's legitimate interest in enforcing its immigration laws. It therefore easily passes ordinary rational-basis review.

Second, Section 1326 is constitutional even under defendant's proposed framework, set forth in *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977). Under *Arlington Heights* review, heightened scrutiny applies to official actions challenged under the Equal Protection Clause based on an allegedly racially disproportionate impact only if there is also evidence of a "racially discriminatory purpose" *and* the court is convinced that Congress would not have passed the statute in the absence of such animus. 429 U.S. at 265, 270 n.21. Disparate "impact alone is not determinative," and courts must assess other evidence in deciding whether a racially discriminatory purpose was "a motivating factor in the decision." *Id*. at 265-66. In this case, defendant's claim of disparate impact, namely the high percentage of Mexican and Latinx arrested for illegally entering or reentering the United States, fails to give rise to an inference of discriminatory intent and is easily explained by the United States' shared border with Mexico and the characteristics of the noncitizen population unlawfully present in this country.

Defendant also fails to present any historical evidence that Congress was motivated by a discriminatory purpose when enacting Section 1326 in 1952. While defendant cites a few extraneous statements related to the passage of the Immigration and Naturalization Act of 1952 generally, none of those statements relate to Section 1326—the one provision of the Act the defendant is challenging. Instead, defendant's principal argument is that the 1952 Congress, when enacting Section 1326, failed to take some affirmative step to purge the purported taint of the allegedly discriminatory purpose 1929 predecessor statute. Even if defendant could

6

demonstrate that the 1929 statute was passed by members of the House and Senate because of racial animus towards Mexicans (he cannot), the Supreme Court has been clear that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful," *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980), and that a successor legislature does not have a "duty to expiate its predecessor's bad intent." *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018). Additionally, defendant would need to show "that the decisionmaker, in this case [the] legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Defendant offers no evidence that the 1952 Congress was aware of a purported discriminatory intent of the 1929 Congress in passing the predecessor statute or of the purported disparate impact of the predecessor statute, let alone any evidence that the 1952 Congress enacted Section 1326 *because* it wanted to achieve a disparate impact or *because* it sought to discriminate against Mexican or Latinx individuals. In any event, Congress's many substantive amendments to Section 1326—including several in the 1990s—make clear that such legislation exists irrespective of any racial animus that members of Congress may or may not have held in the late 1920s, rendering it constitutional even under the most stringent of tests.

Accordingly, every other court considering arguments identical to those presented here has squarely rejected this challenge to Congress's ability to enact

criminal immigration laws.[1] This Court should do the same and deny the Motion without an evidentiary hearing.

---

[1] *United States v. Munoz-De la O*, No. 2:20-CR-134-RMP-1, 2022 WL 508892 (E.D. Wash. Feb. 18, 2022); *United States v. Ponce-Galvan*, No. 21-cr-2227-H-1, 2022 WL 484990 (S.D. Cal. Feb. 16, 2022); *United States v. Hernandez-Lopez*, No. H-21-440, 2022 WL 313774 (S.D. Tex. Feb. 2, 2022); *United States v. Sifuentes-Felix*, No. 21-cr-337-WJM, 2022 WL 293228 (D. Colo. Feb. 1, 2022); *United States v. Maurico-Morales*, No. CR-21-298, 2022 WL 99996 (W.D. Okla. Jan. 10, 2022); *United States v. Sanchez-Felix*, No. 21-cr-00310-PAB, 2021 WL 6125407 (D. Colo. Dec. 28, 2021); *United States v. Rivera-Sereno*, No. 21-cr-129, 2021 WL 5630728 (S.D. Ohio Dec. 1, 2021); *United States v. Amador-Bonilla*, No. CR-21-187, 2021 WL 5349103 (W.D. Okla. Nov. 16, 2021); *United States v. Samuels-Baldayaquez*, No. 4:20 CR 83, 2021 WL 5166488 (N.D. Ohio Nov. 5, 2021); *United States v. Suquilanda*, No. 21 CR 263, 2021 WL 4895956 (S.D.N.Y. Oct. 20, 2021); *United States v. Novondo-Ceballos*, No. 21-CR-383 RB, 2021 WL 3570229 (D. N.M. Aug. 12, 2021); *United States v. Machic-Xiap*, No. 3:19-cr-407-SI, 2021 WL 3362738 (D. Or. Aug. 2, 2021); *United States v. Wence*, No. 3:20-CR-0027, 2021 WL 2463567 (D. V.I. June 16, 2021); *United States v. Gutierrez-Barba*, No. CR-19-01224-001-PHX-DJH, 2021 WL 2138801 (D. Ariz. May 25, 2021); *United States v. Medina Zepeda*, No. CR 20-0057 FMO, 2021 WL 4998418 (C.D. Cal. Jan. 5, 2021).

I.   **Section 1326 Is Constitutional Under Rational Basis Review, the Standard Applicable to an Equal-Protection Challenge to a Law that Regulates the Removal of Noncitizens**

A.   *The Rational Basis Standard Applies*

Defendant's challenge to Section 1326 arises under the Fifth Amendment to the Constitution. Unlike the Fourteenth Amendment, the Fifth Amendment does not contain an express equal-protection provision. Since 1954, however, the Supreme Court has construed the Amendment's guarantee of "due process of law" for all "person[s]," U.S. Const. amend. V., to provide analogous protection. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). The Court has generally applied the same equal-protection standards in both contexts. *See Wayte v. United States*, 470 U.S. 598, 608 n.9 (1985).

Federal immigration and national security laws are an exception to that general rule. *See Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017) ("National-security policy is the prerogative of the Congress and President"); *Hernandez v. Mesa*, 140 S. Ct. 735, 746 (2020) (noting the national security concerns raised by crossings at the U.S.-Mexico border). While state statutes that distinguish between citizens and noncitizens remain subject to heightened scrutiny, *see Graham v. Richardson*, 403 U.S. 365, 371-72 (1971), the Supreme Court has taken a different approach to federal immigration laws drawing such distinctions, in deference to the federal government's exclusive authority over immigration matters. "For reasons long recognized as valid," the Court has explained, "the responsibility for regulating the relationship between the United States and our alien

9

visitors has been committed to the political branches of the Federal Government."
*Mathews*, 426 U.S. at 81. "Because decisions in these matters may implicate 'relations
with foreign powers,' or involve 'classifications defined in the light of changing
political and economic circumstances,' such judgments 'are frequently of a character
more appropriate to either the Legislature or the Executive.'" *Trump v. Hawaii*, 138
S. Ct. 2392, 2418-19 (2018) (quoting *Mathews*, 426 U.S. at 81); *see also Arizona v.
United States*, 567 U.S. 387, 394-95 (2012) (federal government's authority over
"immigration and status of aliens" rests in part on "its inherent power as sovereign
to control and conduct relations with foreign nations"). "The reasons that preclude
judicial review of political questions" thus "also dictate a narrow standard of review
of decisions made by the Congress or the President in the area of immigration and
naturalization," *Mathews*, 426 U.S. at 81-82—including congressional enactments
that "regulate the admission and exclusion of aliens." *Fiallo v. Bell*, 430 U.S. 787, 793
n.5 (1977).

The Seventh Circuit has equated that narrow standard of review with the
rational basis test applied to other classifications that do not affect "fundamental
rights nor proceed along suspect lines," *Heller v. Doe*, 509 U.S. 312, 319 (1993)
(quotation marks omitted). *See, e.g.*, *City of Chicago v. Shalala*, 189 F.3d 598, 604
(7th Cir. 1999) ("Although the [*Mathews*] Court did not adopt explicitly the 'rational
basis' standard of scrutiny, it in effect applied rational basis review, upholding the
legislation because it was not 'wholly irrational'") (citations omitted). That form of
review is deferential. The government need not articulate the purpose underlying its

10

policy or "produce evidence to sustain [its] rationality," *Heller*, 509 U.S. at 320. A "statute survives rational basis scrutiny 'if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *Shalala*, 189 F.3d at 605 (quoting *Heller*, 509 U.S. at 320). Under rational basis review, "Congress need not actually articulate the legitimate purpose or rationale that supports the classification at issue" and "a statute must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id*. (citations and quotations omitted).

The Supreme Court and the Seventh Circuit have applied this "unexacting" standard, *Reno v. Flores*, 507 U.S. 292, 306 (1993)—or arguably more deferential ones, *see Hawaii*, 138 S. Ct. at 2419—to an array of challenges in civil and criminal cases. The Court in *Fiallo*, for example, applied minimal scrutiny to a law that drew a gendered distinction by giving special immigration preferences to mothers, but not fathers, of U.S. citizen children. 430 U.S. at 792-99. Likewise, in *Shalala*, the Seventh Circuit applied rational basis scrutiny to a provision of the Welfare Reform Act of 1996 that disqualified noncitizens lawfully in the United States from various welfare programs. 189 F.3d at 603-605. In *Robledo v. Ashcroft*, 342 F.3d 667 (7th Cir. 2003), the Seventh Circuit applied rational basis scrutiny to an equal-protection challenge of a regulation precluding aliens who have illegally reentered the United States from applying for discretionary relief under 8 U.S.C. § 212(c). 342 F.3d at 682-83. The Seventh Circuit has also routinely applied rational basis scrutiny to other immigration statutes and regulations challenged on equal-protection grounds. *See,*

11

*e.g.*, *Lopez-Ramos v. Barr*, 942 F.3d 376 (7th Cir. 2019) (challenging statutory scheme automatically conferring citizenship on some children born abroad but not others); *Canto v. Holder*, 593 F.3d 638, 641 (7th Cir. 2010) (INA provision exempting certain foreign convictions but not certain domestic convictions from Immigration Code's reasons for removability); *Klementanovsky v. Gonzales*, 501 F.3d 788 (7th Cir. 2007) (statute providing for humanitarian waiver of deportability for criminal aliens who seek to be admitted to United States but not for criminal aliens being deported from the United States). In the criminal context, the Seventh Circuit has employed that standard in rejecting equal-protection challenges to a provision criminalizing otherwise purely domestic hostage taking if any of the offenders are foreign nationals. *United States v. Montenegro*, 231 F.3d 389, 395 (2000).[2]

Defendant's constitutional challenge to Section 1326 is likewise subject to—and fails under—the rational basis standard. That standard applies to his equal-protection challenge because Section 1326 is a law that regulates the admission and

---

[2] Defendant incorrectly cites a district court decision, *Cook County v. Wolf*, 461 F. Supp. 3d 779, 789 (N.D. Ill. 2020) (Feinerman, J.), as a Seventh Circuit decision in support of his statement that the "Seventh [C]ircuit has . . . indicated a willingness to apply the *Arlington Heights* factors to cases involving immigration." R. 14 (citing *Wolf* as "*Cook County v. Wolf*, 461 F. Supp. 3d 779, 789 (7th Cir. 2020). *Wolf* does not help defendant. In *Wolf*, the court distinguished between immigration-related official actions taken on "economic grounds," such as the redefinition of the term "public charge" at issue in that case, from immigration-related actions in the context of international affairs and national security. 461 F. Supp. 3d at 789. As discussed below, Section 1326 is a necessary component of the "national policy of excluding illegal—especially deported aliens," a policy with clear implications for international affairs and national security. *United States v. Carlos-Colmenares*, 253 F.3d 276, 279 (7th Cir. 2001). Accordingly, even if the Seventh Circuit were to adopt the position that the immigration "sphere" shielded from *Arlington Heights* review is limited to matters pertaining to national security or international relations, Section 1326 falls squarely within that "sphere."

removal of noncitizens. *See Fiallo*, 430 U.S. at 792-93 & n.5. Section 1326 is a "regulatory statute enacted to assist in the control of unlawful immigration by aliens." *Pena-Cabanillas v. United States*, 394 F.2d 785, 788 (9th Cir. 1968); *see also United States v. Carlos-Colmenares*, 253 F.3d 276, 278-79 (7th Cir. 2001) (describing role of Section 1326 in relation to deportation laws).

Several aspects of the statute bear out that description. Section 1326 was enacted as part of the INA in 1952. *See* p. 5, *supra*. It is codified in Title 8 alongside other immigration provisions. Most important, its "text . . . plainly reveals its immigration-regulation purpose." *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998). The Seventh Circuit has found that by requiring no proof the defendant knew he lacked the Attorney General's express consent to reenter, Congress intended to "make deported aliens very cautious about reentering the United States without permission—in other words, to give them a strong incentive to steer well clear of the forbidden zone." *Carlos-Colmenares*, 253 F.3d at 278-79 (noting also that "[c]oncern that deported aliens were returning like yo-yos from the countries to which they had been deported is a constant theme in the statutory history that culminated in section 1326"). Because Section 1326 is part of the immigration-regulation framework, equal-protection challenges to it are subject to the same standard that applies to other claims in the immigration context: rational-basis review. *See Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1049 & n.5 (9th Cir. 2017) (collecting cases from Sixth Circuit, Second Circuit, and Third Circuit).

Decisions such as *Fiallo* and *Hawaii* foreclose a searching judicial inquiry into legislative or executive motivations even when the political branches have drawn express distinctions that would trigger close scrutiny outside of the immigration context. It would be incongruous if courts were nonetheless required to probe deeply into legislative motives—"a substantial intrusion into the workings of" a coequal branch, *see Arlington Heights*, 429 U.S. at 268 n.18—when an immigration law that draws no such distinction on its face is alleged to discriminate based on race or national origin. Applying rational-basis review to challenges such as defendant's avoids that irreconcilable result.

B.       *Section 1326 Is Constitutional Under Rational Basis Review*

Section 1326 is constitutional under the rational-basis standard. The relevant question is whether "there is a rational relationship" between the "disparity of treatment" associated with the challenged provision and "some legitimate governmental purpose." *Shalala*, 189 F.3d at 605 (quoting *Heller*, 509 U.S. at 320). There can be no reasonable question that deterring illegal reentry is a legitimate government interest or purpose under the rational basis standard. *See Hudson v. United States*, 522 U.S. 93, 105 (1997) (calling deterrence "a traditional goal of criminal punishment"). "The United States has a legitimate interest in seeing that individuals who cross their borders do so legally and in accordance with set procedures" and a "corollary interest in deterring individuals from crossing its borders illegally." *Robledo*, 342 F.3d at 683. "[I]llegal reentries put the safety of aliens

14

and law enforcement personnel at risk and, more generally, frustrate the orderly administration of the nation's immigration laws." *Id*.

Section 1326 is rationally designed to advance that legitimate interest in deterring illegal reentry. *Carlos-Colmenares*, 253 F.3d at 278-79. *See* S. Rep. No. 70-1456, at 1-2 (1929). Indeed, "without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." *Hernandez-Guerrero*, 147 F.3d at 1078. Section 1326 was drafted specifically to maximize its deterrent value as part of the "administration of the national policy of excluding illegal—especially, previously deported—aliens." *Carlos-Colmenares*, 253 F.3d at 279 (discussing context for Congress' decision to not include in the statute a defense of mistaken belief of consent to reenter). As every district court to apply rational-basis review to analogous challenges has held,[3] Section 1326 is therefore constitutional under that standard.

## II.  Section 1326 Does Not Violate Equal Protection Under the *Arlington Heights* Standard

Even if the court were inclined to apply the *Arlington Heights* standard, the Motion should be denied, because none of the historical or statistical evidence establishes that Congress was motivated by "discriminatory intent" when passing Section 1326 in 1952.

---

[3] *See, e.g.*, *Maurico-Morales*, 2022 WL 99996, at *1; *Amador-Bonilla*, 2021 WL 5349103, at *1; *Samuels-Baladayaquez*, 2021 WL 5166488, at *2; *Novondo-Ceballos*, 2021 WL 3570229, at *4; *Rivera-Sereno*, 2021 WL 5630728, at *4.

*A. Legal Framework*

Generally, claims based on disparate impact alone are not cognizable under the Equal Protection Clause, and instead "[p]roof of racially discriminatory intent or purpose is required to show a violation of" that Clause. *Arlington Heights*, 429 U.S. at 265; *see Washington v. Davis*, 426 U.S. 229, 239-42 (1976). When, as here, the law alleged to discriminate against individuals of a particular race or national origin is neutral on its face, courts evaluate the existence of such intent using the framework from *Arlington Heights*, 429 U.S. at 265-68. Under that framework, "[t]he impact of the official action—whether it bears more heavily on one race than another—may provide an important starting point." *Id*. at 266 (quotation marks and citation omitted). But outside of extreme circumstances not alleged here, disparate "impact alone is not determinative," and courts must assess other evidence in deciding whether a racially discriminatory purpose was "a motivating factor in the decision." *Id*. at 265-66. Pertinent evidence includes "[t]he historical background of the decision," "[t]he specific sequence of events leading to" it, "departures" from "[s]ubstantive" or "procedural" norms, and "[t]he legislative and administrative history . . . , especially . . . contemporary statements by members of the decisionmaking body." *Id*. at 267-68. If the challenger proves that the provision was motivated in part by the prohibited intent, the burden shifts to the government to establish that "the same decision would have resulted even had the impermissible purpose not been considered." *Id*. at 270 n.21.

Several principles inform how courts conduct the "sensitive inquiry" into official motivation required under *Arlington Heights*. *See* 429 U.S. at 266. First,

discriminatory motive has a particular meaning in the equal-protection context. A challenger must show "that the decisionmaker, in this case [the] legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). That standard requires more than proof that the legislature had "awareness of [the] consequences for the affected group, that those consequences were "foreseeable," *id.* at 278-79, or that it acted "with indifference to" the effect of that group, *Luft v. Evers*, 963 F.3d 665, 670 (7th Cir. 2020).

Second, while statements by a bill's proponents may be relevant to the inquiry into intent under *Arlington Heights*, the motives of individual legislators cannot fairly be equated with the intent of the whole legislature. *See, e.g.*, *United States v. O'Brien*, 391 U.S. 367, 383-84 (1968); *see also Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (noting that "the difficulties in determining the actual motivations of the various legislators that produced a given decision increase" when a larger legislative body is at issue).

Third, a legislature alleged to have acted with discriminatory intent is not automatically saddled with the sins of its predecessors. *See City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality) ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful."). In conducting the intent inquiry, courts generally presume that the legislature acted in good faith and require a movant to come forward with evidence that the challenged law—not just a prior one—was motivated in part by a discriminatory purpose. *See Abbott*, 138

17

S. Ct. at 2324-25; *see also City of Mobile*, 446 U.S. at 74 (discriminatory intent must be "proved in a given case"). Such evidence may include proof that earlier legislatures had discriminatory intent when enacting particular laws, *Abbott*, 138 S. Ct. at 2327, but the probative value of such evidence decreases when it is remote in time, *see Dept't of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891, 1916 (2020) ("*Regents*"); *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987), or attributable to a legislature with "a substantially different composition," *Brnovich v. DNC*, 141 S. Ct. 2321, 2349, n.22 (2021) (quotation marks omitted).

The foregoing principles foreclose a finding that Congress acted with racial animus towards Mexican and Latinx individuals in passing Section 1326. Defendant's historical arguments are almost entirely reliant on the imputation of racial animus associated with the 1929 Act to the 1952 Congress more than two decades later. Accordingly, they run afoul of the Supreme Court's rulings in *Abbott*, *City of Mobile*, and *Regents*. Defendant's only evidence of purported discriminatory intent on the part of the 1952 Congress amounts to: (1) President Truman's veto, (2) the Ford letter, and (3) the anti-harboring legislation—all of which relate primarily or entirely to *other* provisions of the Immigration and Naturalization Act of 1952 and say nothing about Congress's motivations for enacting section 1326. In other words, defendant can point to no racial animus as to the Congress that passed the statute he challenges on that ground.

Moreover, defendant's proffered evidence of discriminatory impact does not include any evidence that the 1952 Congress was actually aware of any

discriminatory impact, let alone that the 1952 Congress was motivated by any desire to achieve such an impact. Lastly, as discussed in more detail below, defendant frequently misconstrues the context for the statements he cites as evidence of discriminatory intent.

### B. The Lack of Congressional Debate Regarding Section 1326 Does Not Support an Inference of Discriminatory Intent

Defendant argues that "the legislative history of the 1952 recodification as section 1326" was marked by "racial animus" because "Congress failed to engage in any discussion while recodifying Section 1326 in 1952." R. 19 at 9 (conceding that "section 1326 was not examined" during legislative debate).[4] Defendant's argument contravenes the Supreme Court's warning against "[d]rawing meaning from [Congressional] silence." *Kimbrough v. United States*, 552 U.S. 85, 103 (2007). Just as courts do not lightly treat Congress's "silence [as] tantamount to acquiescence" in judicial or agency decisions, *Zuber v. Allen*, 396 U.S. 168, 185 n.21 (1969), they should not give weight to a legislatures' failure to expressly grapple with the history underlying earlier laws—especially when the legislators are unlikely to be aware of that decades-old history. *See Johnson v. Governor of State of Florida*, 405 F.3d 1214, 1225 n.21 (11th Cir. 2005) (en banc).

Defendant's argument also repeats the error the Supreme Court corrected in *Abbott*, 138 S. Ct. 2305. *Abbott* involved a 2013 districting plan enacted by the Texas

---

[4] The district court in *Carrillo-Lopez* expanded the argument further by explaining an inference of "racial animus" was warranted either because Congress "ignored the express nativist intent behind the [1929] Act" or, if it was aware of that intent, bypassed the "opportunity to either adopt its racial animus or refute its improper motivation and clarify a [permissible] purpose for the statute. R. 19, Ex. A at 19.

legislature after its original 2011 plan was challenged in two courts. *Id*. at 2316-17. Although the legislature adopted the 2013 plan from a version preliminarily approved by a three-judge court, that same court later invalidated the 2013 plan on the ground that it was tainted by the legislature's discriminatory intent in passing the predecessor 2011 plan. *Id*. at 2318. The Supreme Court reversed. In so doing, the Court reaffirmed that discriminatory purpose must be shown as to the actual law being challenged, not the predecessor; the legislature that enacted the successor statute is generally afforded a presumption of good faith; a finding of past discrimination does not "flip[] the evidentiary burden" to the government to prove that the successor statute is free from discriminatory intent, *id*. at 2324-25; and a successor legislature does not have a "duty to expiate its predecessor's bad intent," *id*. at 2325; *see id*. at 2326 n.18.

As the en banc Eleventh Circuit has explained, demanding legislative engagement with a law's history in such cases "establishes an insurmountable burden" because it is unlikely that the present day legislators would be aware of the past discrimination" that supposedly taints the law. *Johnson*, 405 F.3d at 1225 n.21. Defendant cites no evidence that the 1952 Congress had any awareness of the history underlying the illegal-reentry provision that defendant claims to have tainted the 1929 Act.

Moreover, even assuming *arguendo* that an earlier law must be "substantially altered" (R. 19, Ex. A at 17) before a presumption of good faith applies under *Abbott*, Section 1326 satisfies that criterion because the 1952 Congress changed the law

governing illegal reentry in at least two material ways. First, Congress added the "found in" clause now in Section 1326(a), creating a "substantive offense[]" that is "distinct" from the two grounds for liability (entry and attempted entry) in the 1929 Act. *See United States v. Corrales-Beltran*, 192 F.3d 1311, 1319 (9th Cir. 1999). Second, the 1952 Congress enacted Section 1326 to serve as a single illegal-reentry statute that applied the same penalties to all defendants deported for subversive or immoral activities. *See* INA § 403, 66 Stat. 279-80; S. Rep. No. 81-1515, at 646-47, 655-56 (1950); *United States v. Mendoza-Lopez*, 481 U.S. 828, 835 & n.10 (1987).[5] Defendant, of course, is charged with being present and "found in" Chicago, a provision introduced by Congress in 1952, and he is subject to an enhanced statutory maximum penalty on account of a substantive amendment to Section 1326 passed by Congress in 1988—significant deviations from the illegal reentry statute that was conceived of in the 1920s, and which Congress has since deemed necessary to our nation's system of immigration.

### C. Statements by the INA's Opponents Do Not Support an Inference of Discriminatory Intent

Defendant also argues that the 1952 legislation is marked by "racial animus" because Congress ignored President Truman's "call to reexamine the INA of 1952"

---

[5] In *Carrillo-Lopez*, the district court suggested that a law is "substantive[ly]" altered in the relevant sense only if it has been "expressly revis[ed]" to be "more race-neutral." R. 19, Ex. A at 29-30. The district court did not explain how Congress could have made a law already silent as to the offender's race "more race-neutral." Even if *Abbott* required "substantive" changes before applying a presumption of good faith to a successor statute, Section 1326 was entitled to the presumption here.

and subsequent decision to veto the bill, noting Truman's view that the INA perpetuated a "discriminatory policy" of the past. R. 19, 10.

Truman's veto statement, however, "does little to advance [defendant's] argument." *United States v. Machic-Xiap*, No. 3:198-cr-407, 2021 WL 3362738, at *13 (D. Or. Aug. 3, 2021. The statement says "nothing about what President Truman thought about § 1326 specifically." *Id.*; *see Samuels-Baldayaquez*, 2021 WL 5166488, at *3 n.6. As noted by the district court in *Carrillo-Lopez*, "Truman did not explicitly address racism as to Mexican or Latinx individuals" in the veto statement, which "largely objected to the national origin quota system, not Section 1326." R. 19, Ex. A at 20-21. Indeed, President Truman opened his veto message by noting that the bill "contains certain provisions that meet [his] approval."[6] Notably, Senate opponents of the version of INA that was passed, who took issue with various components of the legislation, expressed no concern or disagreement over Section 1326. *See* Joint Statement by Sponsors of New Omnibus Immigration and Naturalization Bill – Senators Humphrey, Lehman, Benton, Langer, Kilgore, Douglas, McMahon, Green, Pastore, Murray, Kefauver, Morse, and Moody, 98 Cong. Rec. 2141-2143 (Mar. 12, 1952). In fact, the competing Senate bill proposed by the INA's opponents—who criticized the national-origin quotas as xenophobic (*see, e.g.*, 98 Cong. Rec. 5169, 5768 (1952) (Sen. Lehman))—contained an illegal reentry law identical to what became

---

[6] *Veto of Bill to Revise the Laws Relating to Immigration, Naturalization and Nationality*, AM. PRESIDENCY PROJECT (June 25, 1952), *available at* https://www.presidency.ucsb.edu/documents/veto-bill-revise-the-laws-relating-immigration-naturalization-and-nationality.

Section 1326. *See* S. 2842, § 276, 82d Cong., 2d Sess. (Mar. 12, 1952). Contrary to defendant's claim, President Truman's veto message, like the floor statements of the INA's congressional opponents, does not support his conclusory allegation that animus motivated Congress to enact Section 1326. *Machic-Xiap*, 2021 WL 3362739, at *13.

> D.   *Defendant Mischaracterizes the Ford Letter and Anti-Harboring Legislation*

Defendant also attempts to impute discriminatory intent from a 1951 letter by Deputy Attorney General Peyton Ford (attached as Exhibit A) commenting on a draft of the INA, and from Congress's enactment of legislation colloquially known as the "Wetback Bill." R. 19, 10-11. Neither supports an inference that Congress acted with discriminatory intent in enacting Section 1326.

With respect to the Ford letter, defendant misleadingly suggests that Congress followed the letter's recommendation to add the "found in" clause to Section 1326, making the statute more punitive, and that the recommendation came in a letter that referred to Mexicans as "wetback[s]." *Id.* That's not true. Ford did not propose the relevant language; he wrote in "response" to the Senate Committee's request for the Justice Department's views on a draft bill that *already contained* the "found in" clause. *See* S. 716, § 276, 82nd Cong., 1st Sess. (Jan. 29, 1951); Ex. A at 7 (noting that the proposed version of Section 276 Ford was asked to review "adds to existing law by creating a crime which will be committed if a previously deported alien is subsequently found in the United States"). Additionally, defendant fails to mention that the term "wetback" appeared in a portion of Ford's letter wholly unrelated to

Section 1326, in which Ford block-quoted three paragraphs of a report of President Truman's Commission on Migratory Labor discussing immigration officers' authority to enter onto private property. Ex. A at 9.[7]

Defendant's argument regarding legislation colloquially known as the "Wetback Bill" is also flawed. R. 19, 11. That bill has nothing to do with Section 1326 and offers no insight into Congress's motivations for passing it. Rather, the bill was an "anti-harboring" measure that targeted those involved in transporting and otherwise facilitating noncitizens' entry into the United States. *See* Pub. L. No. 82-283, 66 Stat. 26 (1952) ("An Act To assist in preventing aliens from entering or remaining in the United States illegally"), codified as amended at 8 U.S.C. § 1324(a). It had been proposed in the same draft bill sent to Deputy Attorney General Ford for comment (§ 274 of S. 716) and was deemed a necessary response to the decision holding an earlier anti-harboring law unenforceable in *United States v. Evans*, 333

---

[7] Ford was not a member of Congress and thus his statements are not direct evidence of Congressional intent during the passage of the INA. *See Sanchez-Felix*, 2021 WL 6125407, at *7. In any event, Ford's letter used the term "wetback" in a block quote from a presidential commission (it was not his word), and he did so in a section of his letter wholly unrelated to Section 1326. And while his use of the epithet should not be imputed to Congress, it is worth noting that President Truman, lauded by defendant as someone properly sensitive to discrimination by vetoing the INA, also used the term "wetback" in his July 13, 1951 "Special Message to the Congress of Agricultural Workers from Mexico," available at https://www.trumanlibrary.gov/library/public-papers/154/special-message-congress-employment-agricultural-workers-mexico. The term likewise was used in opinions of multiple courts of appeals at the time in a way that does not appear to have been intentionally derogatory. *See, e.g.*, *Johnson v. Kirkland*, 290 F.2d 440, 441 (5th Cir. 1961) (describing a statute's purpose as "protect[ing] migrant Mexican workers—referred to traditionally as 'wetback' because of their illegal entry across the Rio Grande—from exploitation by American employers whose normal economic power was enhanced by the illegal status of the workers"); *see also United States v. Sugden*, 226 F.2d 281, 282 (9th Cir. 1955) (noting that Mexican-national illegal entrants were "commonly called 'wetbacks'").

U.S. 483 (1948). *See* Ex. A at 7. The law did not, as defendant claims, punish "the undocumented Mexican providing the labor." R. 19, 11. While the law's inclusion of a proviso that exempted from liability the act of hiring a noncitizen may be evidence of Congress's desire to "appease industries requiring cheap labor" (R. 19, 11), defendant's assertion that the inclusion of that proviso is evidence of racially discriminatory intent is conclusory at best and does little support the requested inference that Congress was motivated by a racially discriminatory purpose when passing section 1326.

### E. Section 1326's Impact on Latinx Defendants Does Not Give Rise to an Inference of Discriminatory Intent

Defendant fails to cite any meaningful statistics to show that Section 1326 has a disparate impact on Mexican and Latinx individuals. While he notes that in 2020, "99.1% of illegal reentry offenders were identified as Hispanic," (R. 19 at 14) that is hardly surprising, given that in 2019 nearly 97% of all deportees hailed from countries in North and South America that were not Canada or the United States.[8] In other words, the statistics suggest, if anything, that Section 1326 is being applied proportionally by nationality. But even assuming *arguendo* that the percentage of illegal reentry arrests and prosecutions involving Hispanics constitutes a true disparate impact, any such figures do not support an inference of discriminatory intent.[9] That is because they fail to account for the obvious alternative explanations

---

[8] *See* https://www.dhs.gov/immigration-statistics/yearbook/2019/table41 (last visited Mar. 8, 2022).

[9] Defendant incorrectly states that the U.S. Border Patrol's "Nationwide Apprehensions by Citizenship and Sector" reports for fiscal years 2007-2019 reflects numbers of individuals "apprehended at borders for illegal reentry." R. 19 at 13. The reports, available at:

for the disparity that are relevant in the immigration context: *i.e.*, (1) the almost 2,000-mile border the United States shares with Mexico; and (2) the fact that Latinx individuals make up a disproportionately high percentage of those illegally in the United States and thus an outsized share of those eligible for prosecution under Section 1326.

In *Regents*, eight Justices recently rejected a similar argument on behalf of beneficiaries of the deferred-action immigration program that the disparate impact of the program's rescission on "Latinos from Mexico, who represent 78% of" the program's beneficiaries, supported an inference that the rescission was driven by a discriminatory purpose. 140 S. Ct. at 1915-16 (plurality); *id*. at 1919 n.1 (Thomas, J., concurring in part and dissenting in part); *id*. at 1936 (Kavanaugh, J., concurring in part and dissenting in part). The Court's lead opinion explained that the disparity did not, "either singly or in concert" with other factors, make out a "plausible equal protection claim." *Id*. at 1915. The plurality reasoned that, "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration program." *Id*. And "[w]ere this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Id*. at 1916.

---

https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Nationwide%20Apprehensions%20by%20Citizenship%20and%20Sector%20%28FY2007%20-%20FY%202019%29_1.pdf, make no reference to the reason for the apprehension. The *Carrillo-Lopez* decision, which cited the same report, indicated it represented the nationality of "persons apprehended at the border," rather than persons "apprehended at borders for illegal reentry." R. 19, Ex. A at 9.

26

*Regents* reflects the sensible proposition that outsized effects on certain populations are an expected byproduct of broad-based immigration regulations and do not necessarily give rise to the same inference of discriminatory intent that might exist in other settings. And that principle applies squarely to defendant's challenge to Section 1326. Because a disproportionate share of the individuals excluded or removed from the United States are Mexican or Latinx,[10] it stands to reason that a high share of those prosecuted for illegally returning after removal will likewise be Latinx. That is all the more true when taking into account the proximity of the United States to Mexico and Central America, and the possibility of returning to the United States from those locations over land. *See United States v. Arenas-Ortiz*, 339 F.3d 1066, 1080 (9th Cir. 2003) (explaining, in the context of a selective prosecution claim, the "common sense" notion "that it would be substantially more difficult for an alien removed to China to return to the United States than for an alien removed to Mexico to do so").

Additionally, the Supreme Court's decision in *Feeney* requires proof that Congress acted in part *because of* Section 1326's adverse effect on Mexican and Latinx defendants, not simply that the effect was known or foreseeable. *Feeney*, 442 U.S. at 278-79; *see Wayte*, 470 U.S. at 610. In a case involving an equal protection challenge to convictions based on a "fake stash house" robbery sting, the Seventh Circuit recently applied that same teaching, finding that even if ATF agents were aware, due

---

[10] *See, e.g.*, DHS, 2019 Yearbook of Immigration Statistics, Table 41 (in FY 2019, 61 percent of all removed aliens—215,205 of 359,885—were Mexican), at https://www.dhs.gov/immigration-statistics/yearbook/2019/table41.

to racial makeup of neighborhood targeted for the "fake stash house" operation, that new targets recruited into plan to rob the "fake stash house" would be Black people, "the 'awareness of that likely consequence does not prove purposeful discrimination,'" absent "other evidence indicating that the ATF affirmatively intended" its initial target to "recruit Black co-conspirators." *Conley v. United States*, 5 F. 4th 781, 798 (7th Cir. 2021) (citing *Feeney*, 442 U.S. at 279).

Similarly, multiple courts of appeals rejected Equal Protection Clause challenges to crack cocaine distribution convictions under the *Arlington Heights* standard based on evidence of the crack/powder cocaine sentencing disparity's "disproportionate impact on African Americans" and Congress's awareness of that disparate impact. *United States v. Dumas*, 64 F.3d 1427, 1429-30 (9th Cir. 1995); *see also United States v. Coleman*, 24 F.3d 37, 39 (9th Cir. 1994); *United States v. Johnson*, 40 F.3d 436, 440 (D.C. Cir. 1994) ("intent . . . requires more than knowledge of consequences"). Like defendant, the appellant in *Johnson* attempted to bolster his evidence of disparate impact by citing racism that allegedly "animated legislative debate" leading to a 1914 predecessor statute decades before the actual 1986 statute giving rise to the Equal Protection challenge, along with much weaker historical evidence related to the 1986 Congress. 40 F.3d at 440. The D.C. Circuit found the evidence of "undeniable racism" related to the passage of the 1914 statute "is of no relevance to our inquiry into the motives of the Congress that passed the 1986 Act." *Id.* (citing *McCleskey* 481 U.S. at 298 n. 20 for proposition that "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little

28

probative value"). The D.C. Circuit likewise rejected the appellant's evidence of the 1986 Congress's allegedly discriminatory motives, noting the evidence was "based only on indications that the statute was passed hastily, without full committee hearings addressing all aspects of the statute, and on the alleged racial imagery contained in a few documents introduced into the Congressional Record and contemporaneous utterances of some legislators." *Id.* ("[W]e think these scattered pieces of legislative history are quite inadequate to serve to attribute a discriminatory purpose to the Congress.").

Defendant, in his Motion, makes no attempt to argue that the 1952 Congress was actually aware of any disparate impact associated with the then-existing reentry prohibition. R. 19, 13 (discussing statistics from 1930s and 1950s but no evidence of 1952 Congress's knowledge of those statistics). Even if the 1952 Congress had been aware of any purported disparate impact, defendant still would be required to show the 1952 Congress was motivated in part *because* of the reentry prohibition's adverse effect on Mexican and Latinx defendants. He has not done so.

> F.     Illegal Reentry Would Have Been Criminalized Irrespective Of Any Animus That Members of Congress Allegedly Harbored 93 Years Ago

In *Arlington Heights*, the Supreme Court expressly held that even where a defendant can show that legislation was motivated by a discriminatory purpose, the challenged action shall be upheld where it is apparent that the same decision would have been reached in the absence of such improper motive. 429 U.S. at 270 n.21. Such is the case here. Congress passed Section 1326 in 1952 after tasking the Senate

Judiciary Committee with making "a full and complete investigation of our entire immigration system." S. Rep No. 81-1515, at 803 (1950). As such, the INA "represents the final product of a most intensive and searching investigation and study over a three-year period." *Pena-Cabanillas*, 394 F.2d at 790. Relevant here, the Judiciary Committee's 925-page report described "difficulties encountered in getting prosecutions and convictions" under existing laws "relating to illegal entry and smuggling of aliens," "especially in the Mexican border area." S. Rep No. 81-1515, at 654-55. It further suggested that the existing law criminalized illegal reentry in different provisions subject to different penalties and "suggested that one act would suffice for all persons who have been deported, regardless of the reason therefore." *Id.* at 655. Congress passed Section 1326 on the basis of those recommendations, and did so with a membership that had experienced a 94% turnover since 1929.[11]

As set forth above, Congress has repeatedly amended Section 1326—in 1988, 1990, 1994, 1996 and 1997. R. 19, Ex. A at 6-7, nn. 9-11. Such amendments altered various aspects of the law, including by broadening its scope and increasing the penalties for violating it—amendments that underscore the deterrent purpose that the statute has always served. Moreover, such alterations to the statute reflect that Congress has on numerous occasions evaluated the efficacy of the illegal reentry statute, decided it did not strike the right balance, and acted accordingly. *See, e.g.,*

---

[11] *Compare 70th Congress (1927-1929): Congress Profiles,* History, Art & Archives, United States House of Representatives, https://history.house.gov/Congressional-Overview/Profiles/70th/ *with 82nd Congress (1951-1953): Congress Profiles,* History, Art & Archives, United States House of Representatives, https://history.house.gov/Congressional-Overview/Profiles/82nd/ (reflecting overlap of only twenty-six members, or approximately 6% of the 82nd Congress).

*Suquilanda*, 2021 WL 4895956, at *5 (post-1952 amendments have served to "enhance penalties or otherwise rebalance the deterrent effect of the law). Tellingly, defendant lodges no accusations of racial animus against the post-1952 Congressional bodies that have considered, debated, and amended Section 1326. It was, and remains, a facially-neutral law, with an obvious and rational purpose, that undoubtedly exists regardless whether certain members of Congress in the 1920s harbored discriminatory views about Mexicans or other immigrants. No matter the test, it is a constitutional law.

## III.    No Evidentiary Hearing Is Warranted

This Court need not hold an evidentiary hearing. Defendant's entire claim rests on *Arlington Heights*. But *Arlington Heights* does not govern equal protection analysis of immigration law. And, the legislative motivations leading up to the 1929 statute are immaterial to an equal protection challenge to the illegal reentry statute that applies in this case—the current law, most recently amended and reenacted in 1997. This illegal reentry statute satisfies rational basis review. The historical and statistical evidence defendant has proffered in support of a purportedly discriminatory motive is fatally flawed for the reasons discussed above and, if necessary, can be evaluated by this Court without an evidentiary hearing.

Defendant has failed to carry his burden of showing that Section 1326 violates the Fifth Amendment's Equal Protection Clause. *Cf. Heller*, 509 U.S. at 320. Instead of grappling with the legislative history of the Immigration and Nationality Act of 1952, defendant focuses on cherry-picked statements of government officials from the 1920s who were either no longer in government or were deceased by the time Section

31

1326 was enacted. Defendant offers little in the way of evidence or argument as to the current law. *See McCleskey*, 481 U.S. at 298 n.20 ("[U]nless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value.").

The Supreme Court has cautioned that courts "should be skeptical . . . of a claim that seeks to invalidate a statute based on a legislature's unlawful motive but does so without reference to the content of the legislation enacted." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 418 (2006). At bottom, this is exactly defendant's approach. He does not engage with the substance of Section 1326 or its clear and obvious purpose. Rather, his motion is aimed at legislative history several times removed from the current version of the statute. In the same way "subsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress," *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (internal quotation marks omitted), the legislative history of an earlier Congress cannot taint a law that has been reenacted repeatedly without animus.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny defendant's motion to dismiss.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney
Northern District of Illinois

By: */s/ Patrick M. Mott*
     Patrick M. Mott
     Assistant United States Attorneys
     219 South Dearborn St., Rm. 500
     Chicago, Illinois 60604
     (312) 554-9133