**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | No. 21 CR 445 |
| v. | ) | |
| | ) | Hon. John J. Tharp, Jr. |
| NICOLAS CALVILLO-DIAZ, | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF HIS
<u>MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

ARGUMENT.......................................................................................................................2

I.   Mr. Calvillo-Diaz's Equal Protection Challenge Must be Analyzed under the *Arlington Heights* Framework ....................................................................................................................2

II.  An Analysis of the Illegal Reentry Law Must Begin with its Criminalization in 1929.................5

    A.  The Government Fails to Cite a Case That Supports its Position that the Full Legislative and Historical Background Should not be Considered.............................................................7

    B.  Precedent Following *Arlington Heights* Confirms that the Analysis Should Include Evidence Related to the 1929 Act........................................................................................................11

III.  The Illegal Reentry Law Fails Under *Arlington Heights*........................................................13

    A.  Lack of Debate and Veto.....................................................................................................14

    B.  Changes to the Law.............................................................................................................18

    C.  The Use of the Term "Wetback" and Other Evidence of Discriminatory Intent in the Reenactment ........................................................................................................................21

    D.  Disparate Impact.................................................................................................................24

IV.  The Government Failed to Demonstrate that the Legislature Would Have Enacted the Law Without Discriminatory Intent ...............................................................................................26

CONCLUSION...................................................................................................................27

## TABLE OF AUTHORITIES

### CASES

*Abbot v. Perez,* 138 S. Ct. 2305 (2018) ................................................................................. 7, 8, 15

*Brnovich v. Democratic Nat'l Comm.,* 141 S. Ct. 2321 (2021) ................................................. 9

*City of Chicago v. Shalala,* 189 F.3d 598 (7th Cir. 1999) ....................................................... 2

*City of Mobile v. Bolden,* 446 U.S. 55 (1980) ...................................................................... 7, 9

*Cook County v. Wolf,* 461 F. Supp. 3d 779 (7th Cir. 2020) ................................................... 4, 5

*Department of Homeland Security (DHS) v. Regents of the University of California,* 140 S. Ct. 1891 (2020) ......... 7, 10, 25

*Espinoza v. Montana Dept. of Revenue,* 140 S. Ct. 2246 (2020) ..................................... 11, 12, 16

*Fiallo v. Bell,* 430 U.S. 787 (1977) ....................................................................................... 2

*Hunter v. Underwood,* 471 U.S. 222 (1985) ............................................................. 8, 12, 13, 25

*Johnson v. Governor of State of Florida,* 405 F. 3d 1214 (11th Cir. 2005) ............................. 16

*Kimbrough v. United States,* 552 U.S. 85 (2007) ............................................................. 14, 15

*Loving v. Virginia,* 388 U.S. 1 (1967) ................................................................................. 3, 4

*Mathews v. Diaz,* 426 U.S. 67 (1976) .................................................................................. 2

*Perry v. Perez,* 565 U.S. 388 (2012) ..................................................................................... 7

*Ramos v. Louisiana,* 140 S. Ct. 1390 (2020) ............................................................. 11, 16, 20

*Robledo-Gonzalez v. Ashcroft,* 342 F.3d 667 (7th Cir. 2003) ................................................. 2

*Trump v. Hawaii,* 138 S. Ct. 2392 (2018) ............................................................................. 5

*United States v. Fordice,* 505 U.S. 717 (1992) ...................................................................... 11

*United States v. Montenegro,* 231 F.3d 389, 395 (7th Cir. 2000). ........................................... 2

*Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252 (1977) .............. passim

*Washington v. Davis,* 426 U.S. 229 (1976) ............................................................................ 6

*Zadvydas v. Davis,* 533 U.S. 678 (2001) ............................................................................... 3

### STATUTES

52 U.S.C.S. § 10301 .......................................................................................................... 7, 9

8 U.S.C. § 1326 .......................................................................................................... 3, 19, 25

Pub. L. No. 82-283, § 276, 66 Stat. 26 (1952) ....................................................................... 19

Pub. L. No. 89-236, 79 Stat. 911 (1965) ................................................................................ 26

### LEGISLATIVE HISTORY

Joint Hearings on S. 716, H.R. 2379, and H.R. 2816 Before the House and Senate Subcomms. of the Comms.
On the Judiciary, 82d Cong., 1st Sess. 716 (1951). .......................................................... 19

S. Rep. No. 81-1515 (1950) ....................................................................................... passim

## INTRODUCTION

The government's response hinges primarily on two incorrect positions. First, the government argues that the Court should not analyze the Defendant's equal protection challenge under the standard normally applied to race-based classifications because the statute relates to immigration. However, the government's ability to regulate immigration does not grant it an unchecked power to discriminate based on race. The illegal reentry law is sending a disproportionate number of Mexicans and Latinx individuals to Federal institutions within the United States. The Defendant's motion does not challenge it because it classifies based on alienage; the challenge is one of race and national origin, as is explicitly clear in the Defendant's motion. Despite the government's apparent belief to the contrary, aliens within the borders of the United States are protected against race-based discrimination.

Second, the government argues that because the law at issue was reenacted 23 years after it was originally passed with discriminatory intent, the Court must ignore multiple factors involved in a typical *Arlington Heights* analysis such as the historical background and legislative history. Instead, the government argues, the Court must consider only whether there is direct evidence of an intent to discriminate present at the time of the law's reenactment. However, a statute originally passed for one purpose does not take on another after a reenactment, nor does the government adequately support its argument to the contrary.

Further, Mr. Calvillo-Diaz does not rely solely on evidence from 1929 but presents multiple pieces of evidence that suggest that discrimination based on race and national origin motivated the passage of both the original law and its reenactment. The government, much like Congress in 1952, fails to engage in any analysis of the clear discriminatory motives present in the law's original enactment. Where the government does respond, its arguments fail to negate the inference that race was at least one motivating factor in the criminalization of illegal reentry. Therefore, the Court

1

should grant Mr. Calvillo-Diaz's motion.

## ARGUMENT

**I.    Mr. Calvillo-Diaz's Equal Protection Challenge Must be Analyzed under the** *Arlington Heights* **Framework**

The government argues that the illegal reentry law must only be analyzed under a rational basis review because it relates to immigration. (ECF No. 25 at 9). This is incorrect for multiple reasons. First, the Defendant does not challenge the law because it distinguishes between citizens and noncitizens or between immigrants and nonimmigrants. The government is generally correct that it is proper to apply the "deferential rational basis test to federal statutes that classify based on alienage." *United States v. Montenegro*, 231 F.3d 389, 395 (7th Cir. 2000). The cases cited by the government are equal protection challenges to statutes that did classify based on alienage. *See Mathews v. Diaz*, 426 U.S. 67, 82-83 (1976) (statute determining eligibility for government benefits challenged because it applied differently to groups of aliens based on legal status of entry and length of residency); *Fiallo v. Bell*, 430 U.S. 787, 789-90 (1977) (statute determining eligibility for preferential treatment in the visa application process challenged because it applied differently to aliens who were either the children or parents of U.S. citizens.); *City of Chicago v. Shalala*, 189 F.3d 598, 600-01(7th Cir. 1999) (statue determining eligibility for government benefits challenged because it applied differently to groups of aliens based on legal status of entry with exceptions for groups like refugees or women escaping abuse). *Robledo-Gonzalez v. Ashcroft*, 342 F.3d 667, 683 (7th Cir. 2003) (statute determining eligibility to apply for relief from a deportation order challenged because it applied differently to groups of aliens based on their prior number of deportations).

These cases are not applicable here. Mr. Calvillo-Diaz does not challenge the illegal reentry law because it distinguishes between aliens and citizens, nor does he challenge it because it distinguishes between groups of aliens based on their prior criminal records or prior deportations. Mr. Calvillo-Diaz challenges the law because it discriminates based on race and national origin.

2

Despite his lack of citizenship, the Defendant is entitled to due process, as the Supreme Court has recognized:

> It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders. But once an alien enters the country, the legal circumstance changes, for the Due Process clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.

*Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

Because of this well-established constitutional protection, the fact that a criminal statute can necessarily only apply to noncitizens within the United States does not provide license for it to otherwise discriminate against them in violation of due process. A rational basis review would potentially be warranted if Mr. Calvillo-Diaz were contesting a deportation provision discriminating based on his citizenship status, but Mr. Calvillo-Diaz is facing incarceration in a federal institution within the borders of the United States based on a criminal law enacted with a discriminatory purpose that disparately impacts Mexicans and other Latinx individuals. The law at issue is not an immigration law, but a criminal law that can result in a term of up to twenty years in federal prison. 8 U.S.C. § 1326(b)(2). There is no "exception to the general rule," that a person within the United States is entitled to due process, even if they will ultimately be deported. (ECF No. 25 at 9). To hold otherwise, as the government suggests, would mean that any federal statute, no matter how flagrantly it discriminates based on race, must be treated with the utmost deference if its application is limited to aliens or if it can be said to relate in some degree to immigration.

Further, the government misunderstands the purpose of the *Arlington Heights* framework, which is itself the analysis that determines what standard of review applies when a challenged law is facially neutral. The first step in any equal protection challenge is "the consideration of whether the classifications drawn by any statute constitute an arbitrary and invidious discrimination." *Loving v. Virginia*, 388 U.S. 1, 10 (1967). It is the classification that determines the level of scrutiny. *Id.* This

3

step is easy when the statute discriminates against a particular group on its face, in which case, "racial classifications, especially suspect in criminal statutes, must be subjected to the 'most rigid scrutiny.'" *Id. Arlington Heights* is a recognition that, in most circumstances, legislators will not state plainly in the law that their motivation is based in some degree on race. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266 (1977). The framework allows the Court to consider other relevant evidence because "when there is a proof that a discriminatory purpose has been a motivating factor in the decision, judicial deference is no longer justified." *Id.* at 265-66. Thus, if after conducting an *Arlington Heights* analysis, the Court determines that there was not sufficient proof of a discriminatory purpose, the law is not subjected to strict scrutiny. *See, e.g., Id.* at 271 ("Respondents simply failed to carry their burden of proving that discriminatory purpose was a motivating factor… this conclusion ends the constitutional inquiry.").

Here, the government suggests that this step should be skipped entirely because the only people within the United States that are claiming discrimination in a criminal statute based on race are also aliens who the government has the power to deport. There is no basis for this position. As referenced in the Defendant's original motion, the Seventh Circuit rejected a similar argument in *Cook County v. Wolf.* 461 F. Supp. 3d 779 (7th Cir. 2020). There, the Court applied the *Arlington Heights* analysis to determine whether the Plaintiff had demonstrated discriminatory intent in the adoption of a rule allowing denial of a visa application to aliens likely to become a public charge. *Id.* at 783-84. The Court, after considering the history of the rule,[1] found that an allegation that the rule

---

[1] While the primary challenge related to a rule promulgated by DHS in 2018, the Seventh Circuit did not ignore all previous iterations of the same law as the government suggests the Court must do here. The Court began its consideration by reviewing the statutory and regulatory background, finding that the "public charge provision has a long pedigree dating back to the Immigration Act of 1882," and stating, "the provision has been part of our Nation's immigration statutes, in various but nearly identical forms, ever since." *Wolf*, 461 F.Supp.3d 779 at 783, citing Immigration Act of 1891, ch. 551, § 1, 26 Stat. 1084, 1084; Immigration Act of 1907, ch. 1134, § 2, 34 Stat. 898, 899; Immigration Act of 1917, ch. 29, § 3, 39 Stat. 874, 876; INA of 1952, ch. 477, § 212(a)(15), 66 Stat. 163, 183; Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, § 531(a), 110 Stat. 3009-546, 3009-674 to -675 (1996).

was motivated by its impact on nonwhite immigrants was "eminently plausible." *Id.* at 788. The Court rejected the government's argument that only a rational basis review should apply because the law concerned immigration. *Id.* at 788-89. The Court noted that while "the president's adoption of preventative measures in the context of international affairs and national security," was entitled to deference, the same is not true for all actions by all governing bodies within the entire realm of immigration law. *Id.* at 789 citing *Trump v. Hawaii*, 138 S. Ct. 2392, 2409 (2018). The Court did not hold, and in fact expressly rejected, the argument that any federal law related to immigration skips the *Arlington Heights* analysis. *Id.* The Court applied that analysis even though the rule at issue concerned the approval of visa applications. *Id. Wolf* provides no support for the government's argument that a criminal statute, which is applicable to aliens within the United States and is challenged based on a racial classification, should not be subjected to an *Arlington Heights* analysis.

If this law was enacted because the legislators were "properly concerned with balancing numerous competing considerations," like those relating to immigration and national security, an *Arlington Heights* analysis would confirm such proper motives and would result in only a rational basis review. *Arlington Heights,* 429 U.S. at 265 "But racial discrimination is not just another competing consideration." *Id.* The Defendant has offered multiple pieces of evidence revealing that discriminatory intent was a motivating factor, much of which the government has refused to respond to at all, and thus, under *Arlington Heights*, the law should be subjected to strict scrutiny. At the very least, the Court should not refuse to consider this evidence simply because the individuals to which the law applies are subject to deportation after a term of incarceration within the United States based on the criminal statute at issue.

## II. An Analysis of the Illegal Reentry Law Must Begin with its Criminalization in 1929

The proper analysis under *Arlington Heights* directs the Court to consider all available evidence, including the historical background of the decision at issue. 429 U.S. 252, 266. The

government does not attempt to defend against the racial animus associated with the illegal reentry law's enactment in 1929. Instead, the government responds as if the Court may only consider evidence occurring immediately before the same law was reenacted in 1952. (ECF No. 25 at 23).

The government's position is in direct contradiction to the holding and purpose of *Arlington Heights.* 429 U.S. 252. There, the Supreme Court explained, "determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. *See also Washington v. Davis,* 426 U.S. 229, 242 (1976) (stating "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts"). The Court stated that this analysis will involve certain factors such as the historical background, legislative history, and statements by members of the decision-making body, but the Court also specified that its suggested factors were not intended to be exhaustive. *Arlington Heights,* 429 U.S at 268. The Court did not limit the analysis to only the most immediate history, the most recent non-substantive amendment, nor only those members of Congress with a demonstratable knowledge of all prior iterations of the same statute; the analysis requires an inquiry into *all* relevant facts that may be available. *Id.* at 266-68.

In the present case, the history behind the statute at issue does not begin with its reenactment in 1952; it begins with its original passing in 1929. The facts associated with the decision to criminalize illegal reentry are certainly relevant facts to the Court's analysis of illegal reentry today. According to the government, "Congress passed Section 1326" based on the recommendations of "the Judiciary Committee's 925-page report." (ECF No. 25 at 36). However, even this report lends support to the Defendant's position. It includes a section describing the illegal reentry law as well as how it has been applied, and then states, "The present Act of March 4, 1929 should be reenacted." S. Rep. No. 81-1515 at 655. In short, the 1952 reenactment was explicitly premised on the 1929 version and to ignore the 1929 Act would be to ignore its history. The Court

must make a "sensitive inquiry," into "the totality of the relevant facts," to determine whether the criminalization of illegal reentry was motivated by race. *Arlington Heights*, 429 U.S. at 266. The government argues that this analysis should not involve any discussion of the Act which criminalized it. Such a rule would belie both precedent and common sense.

### A. The Government Fails to Cite a Case That Supports its Position that the Full Legislative and Historical Background should not be Considered

The cases cited by the government do not support its argument that the Court must ignore the legislative history of the statute challenged by Defendant's motion. Because the motion includes evidence from both the illegal reentry law's original enactment in 1929 and its reenactment in 1952, the government claims that the Defendant's historical arguments "run afoul of the Supreme Court's rulings" in 3 cases: *Abbot v. Perez*, 138 S. Ct. 2305 (2018); *City of Mobile v. Bolden*, 446 U.S. 55 (1980), and *Department of Homeland Security (DHS) v. Regents of the University of California*, 140 S. Ct. 1891 (2020). (ECF No. 25 at 18). None of these cases support the government's position.

In *Abbott*, the Court was asked to review a District Court's determination that voting district maps in the State of Texas were "racial gerrymandering," in violation of the equal protection clause. *Abbott*, 138 S. Ct. at 2314. In a prior related case before the Court, Texas had experienced a substantial increase in population that required it to redraw its electoral districts. *Perry v. Perez*, 565 U.S. 388 (2012). That process required preclearance of the maps through the District Court for the District of Columbia pursuant to the Voting Rights Act (VRA), under which the jurisdiction must demonstrate that its change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color." *Id.* at 390-91 quoting 52 U.S.C.S. § 10301(a). Texas submitted its 2011 plans for approval, but the preclearance would not take place in time for the elections. *Abbott*, 138 S. Ct. at 2315 citing *Perry*, 565 U.S. at 213. Thus, the Supreme Court instructed the State to "start with the [2011] plans adopted by the Legislature but to modify those plans as needed so as not to incorporate any legal defects." *Id.* at 2316.

On remand after that ruling, the District Court found issues in the 2011 plans requiring modification and ultimately made substantial changes before Court-approved modified versions were used in Texas's 2012 elections. *Id.* In 2017, the District Court in Texas was asked to review the 2013 Legislature's version of the plans and it ultimately held that some of the districts created under the plan were unlawful. *Id.* at 2317. However, in so ruling, the District Court reviewed the original 2011 plans, which had never been used in that form in any election, finding that they were motivated by discrimination. From this finding, the Court determined that the 2013 Legislature had not "cured any taint," when it passed its plan in 2013 without deliberation over the 2011 repealed version. *Id.* at 2317-18.

Ultimately, the Supreme Court held that this ruling was in error because the Texas Court had shifted the burden of proof. *Id.* at 2325. Instead of requiring the challenger to prove that the 2013 law was enacted with discriminatory intent, the Court placed the burden on the State of Texas, requiring it to prove that the 2013 Legislature had experienced a true "change of heart," since it had drafted the repealed 2011 plans. *Id.* The Court did not hold, as the government suggests, that an analysis of a law under *Arlington Heights* should never involve consideration of the intention behind an earlier version of the same law that was later reenacted. In fact, the Court in *Abbott* stated the exact opposite. In reference to *Hunter v. Underwood*, where a 1901 law passed with discriminatory intent was overturned in 1985 despite undergoing multiple changes since its original enactment, the Court in *Abbott* distinguished the current issue, explaining: "… we do not confront a situation like the one in *Hunter*. Nor is this a case in which a law originally enacted with discriminatory intent is later reenacted by a different legislature. The 2013 Legislature did not reenact the plan previously passed by its 2011 predecessor." *Abbott*, 138 S. Ct. at 2325, citing *Hunter*, 471 U.S. 222 (1985). The Court made clear that "*under these circumstances*," it is the intent of the 2013 legislature that matters. *Id.* (emphasis added). However, this ruling was explicitly because the 2013 legislature did not reenact

the discriminatory 2011 plans.

Unlike *Abbott*, in the instant case, the 1952 legislature *did* reenact the discriminatory 1929 law. Further, the Defendant is not arguing that the burden should be on the State to prove that the 1952 legislature purged the taint of the law's earlier version. It is the Defendant's burden to prove that the illegal reentry law was motivated by discriminatory intent. However, in meeting that burden, the Defendant is not limited to events taking place in 1952. *Arlington Height*s, *Hunter*, and even *Abbott*, all support a review of the law's original passing and its general history - a history that here begins in 1929 with an Act rooted in eugenics, a fear of non-white immigration, and an intent to protect against the "contamination of Anglo-American society," by "undesirable aliens," like the "Mexican peon." (ECF No. 19 at 5-6)[2]

In *City of Mobile v. Bolden*, the Court again did not hold that when a law is later reenacted by a different Congress, its prior version should not be considered. In *Bolden*, the Court held that a facially neutral voting law only violated a provision of the VRA if it was motivated by a discriminatory purpose. 446 U.S. at 62. Shortly thereafter, *Bolden* was explicitly overruled by Congress when it amended that section of the VRA, changing it to state that the correct test for vote-dilution laws is not only when a law was intended to deny or abridge the right to vote based on race, but also when a law "results in" a denial or abridgement of that right. *Brnovich v. Democratic Nat'l Comm.,* 141 S. Ct. 2321, 2332 (2021) citing *Bolden*, 446 U.S. at 68-70 quoting 52 U.S.C.S. § 10301(a). However, to the extent that *Bolden* should be relied upon, the Court there held "that a substantial history of official racial discrimination in Alabama" was not sufficient proof that the specific challenged voting law in the State was enacted with discriminatory intent. *Bolden*, 446 U.S. at 74.

---

[2] Lytle Hernandez, *Migra!: A History of the U.S. Border Patrol*, 28 (2010); Jared A. Goldstein, *Unfit for the Constitution: Nativism and the Constitution, from the Founding Fathers to Donald Trump*, 20 U. Pa. J. Const. L. 489, 510 (2018); *The Eugenical Aspects of Deportation: Hearings Before the Committee on Immigration and Naturalization House of Representatives*, 70th Cong. 70.1.4, pp.2-3 (1928).

Here, the Defendant does not argue that the illegal reentry law is intentionally discriminatory because of a general history of discrimination in the United States at large. Thus, Defendant's historical arguments concerning the 1929 Act do not "run afoul," of any holding in *Bolden* as the government claims. (ECF No. 25 at 18).

In *Regents*, the Court held that the termination of the Deferred Action for Childhood Arrivals (DACA) was a violation of the Administrative Procedure Act. 140 S. Ct. at 1915. The Court further considered whether the termination violated equal protection and held that the respondents had not sufficiently pled that race was a motivating factor in the agency's decision to terminate DACA. *Id.* at 1915-16. The government cites this case first in support of its argument that any proof of an earlier legislatures' discriminatory intent may be relevant under *Arlington Heights* but "the probative value of such evidence decreases when it is remote in time." (ECF No. 25 at 24) citing *Regents*, 140 S. Ct. at 1916. However, this discussion in *Regents* referred to the probative value of statements made by President Trump, not statements made by parties from DHS who took the challenged action, and while Trump's statements disparaged Mexican and Latinx immigrants, they were both remote in time from the decision made by the agency to rescind DACA and were "made in unrelated contexts." *Id. Regents* does not discuss the probative value of statements made contemporaneously by members of Congress with a law's original passage to its later reenactment. The statements cited by in the Defendant's motions are "statements by members of the decision-making body," and are properly considered. *Arlington Heights*, 429 U.S. at 268.

In sum, the government asks the Court to ignore the clear directive of the Supreme Court in *Arlington Heights* that the "historical background of the decision is one evidentiary source" for proof of intentional discrimination. *Id.* at 267. However, the government cites to no case in which the Supreme Court held that the relevant history of a statute is confined solely to its most recent version. On the contrary, the Supreme Court has held the opposite on multiple occasions.

**B. Precedent Following *Arlington Heights* Confirms that the Analysis Should Include Evidence Related to the 1929 Act**

Following *Arlington Heights*, the Supreme Court has rejected arguments like those raised by the government in its response. For example, in *United States v. Fordice*, the Court held that official policies that were "traceable," to a State's prior racial segregation and that still "have discriminatory effects," offend the equal protection clause. 505 U.S. 717, 729 (1992). More recently in *Ramos v. Louisiana*, the Court invalidated state laws permitting nonunanimous verdicts because race was a motivating factor when they were adopted despite the laws having since been amended. 140 S. Ct. 1390, 1394 (2020). There, the majority rejected Justice Alito's dissent in which he argued that the Court should not consider whether a law was originally motivated by discrimination if it was readopted under different circumstances years later. *Id.* at 1426 (J. Alito, dissenting). The majority responded that the Court's role in the relevant constitutional analysis was to assess the functional benefits of a rule and thus, asked "how can that analysis proceed to ignore the very functions those rules were adopted to serve?" *Id.* at 1401, n. 44 (internal citations omitted).

Similarly, in an *Arlington Heights* equal protection analysis, the Court must determine whether a law that appears neutral was intended to function in a discriminatory manner. An analysis of whether the illegal reentry law was so intended cannot proceed if the Court ignores the significant evidence of the function the rule was adopted to serve when it was passed in 1929. Considering the statute has only become more punitive since then, there is nothing to suggest that the statute is now free of its original motivations, especially not to the extent that they should be entirely ignored as the government suggests.

Shortly after *Ramos*, in *Espinoza v. Montana Dep't of Revenue*, the Court reaffirmed the logic it employed in *Ramos* by overturning a law based on its history of religious discrimination, despite it having been reenacted years later "for reasons unrelated to anti-Catholic bigotry." 140 S. Ct. 2246, 2259 (2020). There, Justice Alito now concurred, recognizing that "*Ramos* is now precedent," and

11

therefore, "the original motivation for the laws," matters, even when those same laws are readopted "for non-discriminatory reasons." *Id.* at 2268 (J. Alito, concurring). Neither of these cases dealt specifically with equal protection challenges, however, in both, the Court found it proper to consider a law's original motivation in an analysis of whether a later version violated a constitutional provision. Thus, the same logic would apply in an equal protection context and the Court should consider the illegal reentry statute in its full historical context.

Perhaps most on point is *Hunter v. Underwood*, in which the Court in 1985 held that a state constitutional provision violated equal protection because it was intended to disenfranchise black people when it was passed in 1901, despite multiple non-discriminatory amendments since then. 471 U.S. 222 (1985). In rejecting the same argument raised by the government's response, the Court stated:

> At oral argument in this Court, appellants' counsel suggested that, regardless of the original purpose of § 182, events occurring in the succeeding 80 years had legitimated the provision. Some of the more blatantly discriminatory selections…. have been struck down by the courts, and appellants contend that the remaining crimes….are acceptable bases for denying the franchise. Without deciding whether § 182 would be valid if enacted today without any impermissible motivation, we simply observe that its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect. As such, it violates equal protection under *Arlington Heights*.

> *Id.* at 232-33.

Similarly, here, the illegal reentry law was motivated by a desire to discriminate against Mexicans and other Latinx individuals on account of race and national origin and it continues to this day to have that effect. The amendments to the section at issue in *Hunter* were considerably more significant than the differences between the 1929 and 1952 versions of the statute at issue here and yet the Court did not find those amendments persuasive. *Id.* Thus, the fact that the same statute passed in 1929 was reenacted in a nearly identical form in 1952 does not confine the Court to an analysis of only the moment it was reenacted. Further, as will be addressed below, the Defendant's

motion raised significant evidence suggesting that a discriminatory motive was still present in its reenactment.

### III. The Illegal Reentry Law Fails Under *Arlington Heights*

An analysis under the *Arlington Heights* standard reveals that the illegal reentry law violates equal protection. First, it is important to note that the government suggests throughout its arguments that the Defendant should be held to a higher standard than that required under *Arlington Heights*. For example, the government suggests that only direct evidence of Congress' intent may be offered, but *Arlington Heights* plainly states that circumstantial evidence is appropriate. (ECF No. 25 at 30, n.7); *Arlington Heights*, 429 U.S. at 266. The government suggests that statements by members of Congress, as well as the bill's proponent, are improperly offered as "cherrypicked" evidence of Congress' motivation, despite "statements by members of the decision-making body" appearing as an enumerated factor in *Arlington Heights*. (ECF No. 25 at 23, 31); *Arlington Heights*, 429 U.S. at 268. Further, there is no requirement that the Defendant prove that Congress acted specifically "because it wanted to achieve a disparate impact," nor must the Defendant prove that when each subsequent amendment was passed, that specific Congress evidenced its own continuing intent to discriminate. (ECF No. 25 at 13, 37).

The burden under *Arlington Heights* is to demonstrate that a "racially discriminatory intent or purpose," was a "motivating factor in the decision." 429 U.S. at 265-66. It need not be the sole motivation for the legislature's actions, nor must it be the dominant or primary motivation. *Id.* The moving party must demonstrate that, "the original enactment was motivated by a desire to discriminate," and it "continues to this day to have that effect." *Hunter*, 471 U.S. at 233. Mr. Calvillo-Diaz has met this burden. The Defendant's motion describes a historical background in which a fear of non-white immigration rooted in eugenics takes hold in the 1920's and continues throughout the decades, becoming even more focused on Mexican and Latinx individuals as they begin to

13

immigrant to the United States in greater numbers. The legislative history, sequence of events, and statements by members of Congress further demonstrate that race was at least one motivating factor in the decision to criminalize illegal reentry. The government is solely focused on some pieces of evidence that relate only to its reenactment, but its response fails to offer a compelling reason to ignore the law's original motivation. There is no reason to assume that Congress' reenactment in 1952 was uninformed but well-intentioned, as the government suggests, as opposed to a reinforcement of the same discriminatory goals.

### A. Lack of Debate and Veto

The Defendant's motion argues that Congress in 1952 was aware of the racial animus motivating the illegal reentry law and yet failed to debate it, despite doing so for other racially motivated statutes in the relevant immigration laws. Further, Congress then overruled a presidential veto advising it to "reexamine the entire matter," because it was "a discriminatory policy," that was "utterly unworthy of our traditions and ideals."[3] The government dismisses each, claiming the veto and lack of debate do not infer any meaning, and arguing again that the 1952 Congress should not be held responsible in any measure for reenacting a law passed with discriminatory intent 23 years prior. However, the cases cited by the government do not apply to the situation currently before the Court.

First, the government argues that a lack of debate prior to Congress' reenactment in 1952 does not infer discriminatory intent because one should not take meaning from congressional silence. (ECF No. 25 at 19) citing *Kimbrough v. United States*, 552 U.S. 85, 103 (2007). In *Kimbrough*, the Court did warn the government not to draw meaning from congressional silence, but the context was important. *Id*. The government was arguing that an Act of Congress prohibited the Sentencing Commission and the Courts from disagreeing with a 100-to-1 crack/powder sentencing ratio. *Id*. at

---

[3] *Veto of Bill to Revise the Laws Relating to Immigration, Naturalization, and Nationality*, AM. PRESIDENCY PROJECT (June 25, 1952), available at: https://www.presidency.ucsb.edu/documents/veto-bill-revise-the-laws-relating-immigration-naturalization-and-nationality.

102. The Court rejected this argument because there was no support found in the text of the Act itself. *Id.* at 106. However, in the context of an equal protection analysis under *Arlington Heights*, the Court must always attempt to draw meaning despite congressional silence in the text of the Act itself. If the statute at issue here facially discriminated, the analysis would be different.[4] It is precisely because the statute is facially neutral that other direct and circumstantial evidence of Congress' motivation is required before the law must be subjected to strict scrutiny. *Arlington Heights*, 429 U.S. at 265-67.

The government further relies on *Abbott*, again claiming that the Court's ruling there foreclosed the possibility of considering the 1929 Act because it was reenacted in 1952. (ECF No. 25 at 25-26). As explained in detail in an above section, the Court in *Abbott* held that the lower Court erred by placing the burden on the government to prove that a law did not contain the same discrimination from a prior version. 138 S. Ct. at 2325. The Court in *Abbott* did not hold that a Defendant, who rightfully has the burden under *Arlington Heights,* is barred from introducing evidence of discrimination contemporaneous to its passing if that law was later reenacted. Mr. Calvillo-Diaz is not asking the Court to place the initial burden on the government to prove that the 1952 Congress somehow purged the taint of the 1929 Act; Mr. Calvillo-Diaz is asking the Court to view the illegal reentry law's entire legislative history, which includes the 1929 version, when determining whether the Defendant has met his burden. It also bears repeating that the piece of legislation involved in *Abbott* was not reenacted at all. *See Id.* ("The 2013 Legislature did not reenact the plan previously passed by its 2011 predecessor"). In sum, *Abbott* does not resolve any issue in this case.

---

[4] The government appears to suggest that the analysis would not be any different if Section 1326 facially discriminated based on race. The government argues that a federal statute relating to immigration should only ever be subjected to a rational basis review, even though the statute at issue here is a criminal statute resulting in the incarceration of aliens located within the United States, and even though the Defendant challenges it based on a racial classification. *Arlington Heights* is the proper test when a facially neutral statute is challenged based on a racial classification, but the government rejects it. There is no reason to believe that the government would not similarly reject the strict scrutiny analysis applied to facially discriminatory statutes if the facially discriminatory statute was somehow related to immigration.

The government also argues that the Court should refuse to consider the historical background involved in criminalizing illegal reentry because "the legislators are unlikely to be aware of that decades-old history." (ECF No. 25) citing *Johnson v. Governor of State of Florida*, 405 F. 3d 1214, 1225, n.21 (11th Cir. 2005) (en banc). In *Johnson*, the Eleventh Circuit dealt with an equal protection challenge to an 1868 disenfranchisement law that was then reenacted 100 years later in 1968.[5] 405 F.3d 1214. The Court ultimately ruled that the law was constitutional. *Id.* at 1226-27. However, the version that was reenacted 100 years later was substantively altered and there was not sufficient evidence that the 1868 version of the law was itself motivated by discriminatory intent. *Id.* at 1225-27. Thus, the Court in *Johnson* agreed with the Defendant that an analysis of the original provision is necessary. Further, the challenger in *Johnson* conceded that there was no discriminatory intent involved in the law's reenactment 100 years later. *Id.* at 1223, n.18. The Defendant's motion argues the discriminatory intent *did* still exist when the law at issue here was reenacted, only 23 years later.

The government further cites *Johnson* claiming it held that expecting the legislature to engage with a law's history before reenacting it would create an "insurmountable burden." (ECF No. 25 at 26). However, the Court did not suggest that was true in any situation other than the one before it in which there was very little evidence of any discriminatory intent in 1868 and no evidence at all 100 years later when the law was reenacted. Importantly, the Court noted, "Prior to this case, no expert had ever suggested that the 1868 disenfranchisement provision was motivated by racial discrimination." *Johnson*, 405 F.3d at 1225, n.21. The Court found it would be an insurmountable

---

[5] The Court in *Johnson* acknowledged key points that are contested by the government: First, the Court acknowledged that it was required to review the law under an *Arlington Heights* framework and acknowledged that must include analysis of the 1868 law, even though the Defendant was charged with a later version of the same provision. *Johnson*, 405 F.3d at 1218. Second, the Court acknowledged that the Supreme Court has never held that a reenactment automatically clears the record of a prior law stating, "In *Hunter*, the Supreme Court left open the precise question we confront here: whether a subsequent legislative re-enactment can eliminate the taint from a law that was originally enacted with discriminatory intent." *Id.* at 1223. As the Defendant explained above, the Supreme Court has now answered that question in *Ramos* and *Espinoza*. While not specific to equal protection challenges, these two cases held that the original motivation behind a law later reenacted does matter in a constitutional analysis. *Ramos*, 140 S. Ct. at 1401; *Espinoza*, 140 S. Ct. at 2268.

burden to prove that the legislators who reenacted the law 100 years after its original enactment had grappled with its racist history because no one had ever suggested that it had a racist history. The same is not true of the 1929 Act and its reenactment 23 years later. This is especially clear in that, as the government points out, the members of Congress who reenacted the law in 1952 were provided with a 925-page Report detailing the prior immigration Acts in full. (ECF No. 25 at 36). Thus, there is direct evidence that the Congress passing the 1952 Act was fully aware of the "decades-old history," that it was tasked with reimagining. Regardless, the Court in *Johnson* certainly did not imply that members of Congress are under no responsibility to engage with a law's demonstrated history of discrimination before blindly reenacting it.

Congressional silence is relevant here not because silence itself proves a discriminatory intent but because the silence was after Congress was tasked with reforming immigration policies that were openly adopted to control the racial composition of the population and after Congress had been provided with statistics and criticisms concerning current immigration provisions, including illegal reentry and its primary application to Mexican populations. *See* S. Rep. No. 81-1515, at 364-65 (1950). Despite this, Congress failed to substantively change the illegal reentry law or to even debate it, opting instead to make it easier to apply. Further, after a call to "reexamine the entire matter," in President Johnson's veto, Congress failed to do so. The Defendant does not claim that President Johnson directly condemned the bill's effect on Mexicans or explicitly named the section at issue here when vetoing the bill, but this evidence demonstrates that Congress was aware of the very public criticisms related to its immigration policies. Both are pieces of legislative history properly considered in an *Arlington Heights* analysis, and both support a discriminatory intent in that Congress had knowledge of the discriminatory motives involved in the illegal reentry law. The fact that Congress was silent in the face of this knowledge does support an inference that "invidious discriminatory purpose" was at least one motivating factor. *Arlington Heights*, 429 U.S. at 266.

**B. Changes to the Law**

The government claims that there were substantive changes made to the law in 1952 that set it apart from any discriminatory motive that may have been present in the 1929 version. (ECF No. 25 at 26-27). First, the government claims that the "the 1952 Congress enacted Section 1326 to serve as a single illegal-reentry statute that applied the same penalties to all defendants deported for subservice or immoral activities." (ECF No. 25 at 27). However, this is the rationale behind the recommendation to *not* reenact section 4 of the 1917 act and is one reason why it was decided that "the present act of Match 4, 1929 should be reenacted." S. Rep. No. 81-1515 at 655. The full quote referred to by the government states:

> The necessity of correlating the criminal provisions of the law received much comment. A good example of such correlation may be found in the act of March 4, 1929 and section 4 of the 1917 act. Both acts penalize a reentry after deportation but section 4 relates only to the reentry of persons deported as prostitutes or other immoral persons. It was suggested that one act would suffice for all persons who have been deported, regardless of the reason therefor, and that the present act of March 4, 1929 should be reenacted to cover any and all deportations.

> *Id.*

The fact that the illegal reentry provision of the 1929 Act was reenacted as Section 1326, in part because its language was more expansive and could serve the same purpose as a separate statute that was therefore redundant, is not a substantive change to the law. If anything, this quote directly demonstrates that the 1952 Congress was aware that it was reenacting the 1929 illegal reentry law. It does not reveal any substantive change that would warrant treating the two as entirely different pieces of legislation with unrelated motives.

The government further claims that it was a substantive change when Congress allowed prosecution of those "found" within the United States. (ECF No. 25 at 27). This word was added to the illegal reentry law because of difficulties in determining the proper venue when the prosecution did not know where exactly the person had crossed into the United States. *See* Govt. Ex. A. at 7. When an alien was "found" within the United States prior to 1952, venue was unclear and there

18

were enforcement problems, "especially in the Mexican border area," where the practice of local

farmers "hiring and firing wetbacks," was "so much of a custom that it [was] difficult to impress

many of these farmers with the fact that Mexican aliens are subject to immigration law." S. Rep. No.

81-1515, at 646-47. This change in 1952 to make the law easier to enforce in the Mexican border

area supports the Defendant's argument that racial animus against Mexicans was still pervasive; it

does not somehow disprove that racial discrimination was a motivating factor.

While the government claims that the Ford letter is irrelevant, its direct call to change the

language of Section 1326 to provide better clarity "in those cases in which it is not possible for the

immigration and Naturalization Service to establish the place of reentry, and hence the proper

venue, arising in prosecutions against a deported alien under the 1929 Act," echoes the same

enforcement concerns. *See* Govt. Ex. A at 7. *See also* Joint Hearings on S. 716, H.R. 2379, and H.R.

2816 Before the House and Senate Subcomms. of the Comms. On the Judiciary, 82d Cong., 1st

Sess. 716 (1951). The Ford letter suggests altering the language of the relevant part of the illegal

reentry law to:

> (2) enters, attempts to enter, or is at any time found in, the United States unless (A) prior
> to his embarkation at a place outside the United States or his application for admission
> from foreign contiguous territory, the Attorney General has expressly consented to such
> alien's reapplying for admission; or (B) with respect to an alien previously excluded and
> deported, unless such alien shall establish that he was not required to obtain such
> advance consent under this or any prior act…

Govt. Ex. A at 7.

This exact language was adopted in full in the 1952 version. Pub. L. No. 82-283, § 276, 66 Stat.

26 (codified at 8 U.S.C. § 1326) (1952)). The only difference between the suggested language from

the Ford letter and the version that is currently effective today is that "excluded and deported," is

currently "denied admission and removed," a substitution made by amendment in 1996. *See* 18

U.S.C. § 1326. A letter submitted in response to a call for comment from Congress, which contained

a recommendation then adopted in full, is a part of the relevant legislative history. The Ford letter

19

demonstrates that the changes made to the law were to increase its use, not to lessen its original discriminatory intent.

The addition of this word does nothing to undo the law's motivation of keeping out "the scoff and scum, the mongrel, the bootlegger element, from Mexico,"[6] or as it was later worded by Senator McCarran, the sponsor of the 1952 Act, those "who have not become integrated into the American way of life, but which, on the contrary are its deadly enemies."[7] While Senator McCarran did not identify who exactly the, "deadly enemies," were, the Senate Report plainly identifies the Mexican immigrant population as that which is most resistant to assimilation. *See* S. Rep. 81-1515 at 150 ("As a group, Mexicans have been slow to assimilate. They differ from the Anglo-Americans in language and religion. In 1940, only 7 percent of the native white persons giving their parental origin as Mexico recorded their mother tongue as English. This was by far the lowest percentage recorded by any immigrant stock."). Regardless of this addition, there is evidence of similar motivations in the history of both versions.

Overall, the addition of the word, "found," as well as the amendments to the law since 1952 are minor changes that make the law more punitive, not "significant deviations from the illegal reentry statute that was conceived of in the 1920's," as the government claims. (ECF No. 25 at 27). The Supreme Court has suggested that, "where a law otherwise is untethered to racial bias—and perhaps also where a legislature actually confronts a law's tawdry past in reenacting it—the new law may well be free of discriminatory taint." *Ramos*, 140 S. Ct. at 1410. Here, however, there is no evidence that Congress did anything other than reenact a law because of similar motivations. The changes raised by the government were not an attempt to confront the law's discriminatory past but were instead a

---

[6] 69 Cong. 69 (1926) (letter from constituent agreed to by Rep. Box and Commissioner General of Immigration Rep. Albert Johnson who read the letter into the record during the Hearing Before the Committee of Immigration and Naturalization)
[7] 99 Cong. Rec. 1517 (1953) (statement of Sen. McCarran)

reinforcement of the same considerations.

**C. The Use of the Term "Wetback" and Other Evidence of Discriminatory Intent in the Reenactment**

The government claims that the use of the term, "wetback," which appears in the title of a bill offered by the same Congress, in the Ford letter, and in the legislative history prior to reenacting the illegal reentry law, has no bearing on whether Congress had a discriminatory intent towards Mexicans. (ECF No. 25 at 30). The government further claims that because other politicians and Courts used this racial slur around the same time, it should be ignored. (*Id.* at n.7). Indeed, there are many words that were considered acceptable in 1929 and in 1952 that are recognized as derogatory slurs today. However, the term "wetback" was just as racist in 1952 even though its use was socially acceptable. The Senate Report states, "Mexicans, who were subject to exclusion on illiteracy or other grounds, effected illegal entry by wading the shallow Rio Grande giving rise to the term "wetback," which is the term presently used in reference to all illegal Mexican entrants." S. Rep. No. 81-1515 at 573. The fact that the 1952 Congress used a racial slur to refer specifically to the population that is disparately impacted by the illegal reentry law is certainly relevant evidence of whether Congress had an intent to discriminate against them. The Court must analyze whether Congress was motivated in part by discrimination, and if so, the law is subjected to strict scrutiny regardless of whether discrimination against a particular race or country of origin was common at the time.

Despite the government's claims to the contrary, there is significant evidence in the historical background and legislative history of the reenactment itself, much of which is related to the same need for compromise identified in the Defendant's original motion. Specifically, the nativists in Congress wanted a way to deter Mexicans from living in the United States and "poisoning the American citizen,"[8] but others were opposed to adding Mexico to the quota system because it would

---

[8] 70 Cong. Rec. 3619 (1929) (statement of Rep. Fitzgerald)

21

interfere with the need for Mexican labor in states along the border.[9] Similar motivations remained
present in 1952 and were heightened by the fact that, since 1929, there had been a "tremendous
influx of wet-backs." S. Rep. No. 81-1515 at 586. The Report explains this was because those who
entered the United States to provide labor then "returned to Mexico and told their friends and
relatives about the availability of jobs in the United States at good wages." *Id.* Thus, "Word has
spread throughout all Mexico and many Mexicans from the interior of Mexico have flocked to our
borders seeking admission, legally or otherwise." *Id. See also Id.* at 573 ("It is difficult to impress
many of the farmers with the fact that Mexican aliens are subject to the immigration law."); *Id.* at
584 ("Texas farmers hire 'wetbacks' regardless of the fact that they are illegal entrants.") *Id.* at 630
("A large majority of our apprehended illegal entrants are Mexican; most of them have come to seek
agricultural employment.").

Overall, this Senate Report cited by the government and in the Defendant's original motion,
does little to suggest that any discrimination present in 1929 had lessened and instead identifies
Mexican immigration as a primary source of fear in the 1950's. For example, there is a discussion on
how Mexicans commit more crimes, refuse to assimilate by raising their children to speak Spanish,
and are more likely to need assistance from the government. *Id.* at 150 ("As a group Mexicans have
been slow to assimilate" and have the "lowest percentage recorded by any immigrant stock," of
English speakers); *Id.* at 176 ("An enormous proportion of Mexicans become charitable cases within
a short time or they end up in penitentiaries or jails"); *Id.* at 187 and 193 (comparing Mexican-born
crime rates to those of other immigrant populations and stating "some foreign-born groups are
committed for serious offenses more frequently than other foreign-born groups. Notable among
these are the Mexican-born and the Italian-born").

Further, these concerns were premised explicitly on race or country of origin, considering

---

[9] *See* ECF No. 19 at 8 for the full discussion of this motivation.

Canadians did not receive the same treatment. The Report identifies that "the granting of nonquota immigration status to immigrants born in Western Hemisphere countries gives rise to the most serious problem" because the lack of a numerical restriction resulted in a high percentage of people coming from Canada and Mexico. *Id.* at 460, 472. This interfered with "one of the primary objectives in the establishment of our quota system," which was "to preserve the balance among the various elements in our white population." *Id.* at 430. Thus, there was objection to continuing the exemption because "it has been contended that many of the natives of those countries are of stock similar to the stock of southern Europe and should therefore be subject to numerical restrictions." *Id.* at 472-73. However, the report further points out that "90 percent of the immigrants from Canada were of northern and western European stock." *Id.* at 446. Thus, the "most serious problem," appears to be not *all* Western Hemisphere immigrants, but instead those from Mexico and Central America who, unlike Canadians, were not of the preferred "stock." *Id.* The report confirms that these populations are the primary concern, stating:

> Aliens are entering from Mexico and Central America who barely live above, or even below, the subsistence level and who are content to live on their earnings during summer months and public relief the rest of the year, since their standard of living on charity is higher than it was before they entered the United States. It was also stated that these aliens have shown little capacity for self-government, have seldom applied for citizenship, and generally cannot be depended upon to support wholeheartedly our democratic institutions. As a matter of self-protection, it was argued these aliens should be placed under some numerical restriction.

> *Id.* at 473.

Congress rejected the call to add a numerical restriction, just as it did in 1929, again after receiving significant information on labor shortages in border states, but Congress did reenact the illegal reentry law, thereby continuing to strike a balance by maintaining the lack of a quota and using criminal sanctions instead. Despite more careful language than that employed in 1929, the goal is the same - allowing Mexican and Latinx individuals to enter when labor was needed but ensuring that they'd be deterred from staying by a criminal sanction instead of a mere deportation.  Just like

the original criminalization of illegal reentry, its reenactment is at least motivated in part by the desire to deter those of a specific race and national origin from living in the United States.

### D. Disparate Impact

The Defendant has shown that the illegal reentry law bears more heavily on Mexicans and Latinx individuals. This is all that is required under *Arlington Heights,* which imposes no requirement that the Defendant prove Congress intended to cause the specific resulting disparate impact or had knowledge of an existing disparate impact. The government responds that, "Section 1326 is being applied proportionality by nationality," but it does not cite to evidence that supports this, instead offering statistics on the nationality of aliens who were deported. (ECF No. 25 at 31). Because a disproportionate number of Mexicans and Latinx individuals are prosecuted under the illegal reentry law, and conviction of that law results in deportation after a term of incarceration, this list would reflect a disparate impact, not disprove it. The Defendant offers multiple statistics in his motion that do reveal a disparate impact, which the government responds can be explained by the fact that many unauthorized immigrants are Hispanic. However, the statistics nonetheless reveal a disparate impact. For example, in 2019, 99.0% of people convicted of illegal reentry were Hispanic.[10] However, in the same year, even assuming the category of "Hispanic," covers Mexico, as well as all countries in Central America and South America, only 75% of the unauthorized immigrant population was Hispanic.[11] This is a disparate impact.

Further, the government writes that the Defendant has failed to meet his burden because of a failure "to account for the obvious alternative explanations for the disparity that are relevant in the immigration context," which are a shared border with Mexico and the fact that Latinx individuals "make up a disproportionately high percentage of those illegally in the United States." (ECF No. 25

---

[10] U.S. Sentencing Commission, *Quick Facts: Illegal Reentry Offenses Fiscal Year 2019* (2020).
[11] Migration Policy Institute, *Profile of the Unauthorized Population: United States*, (2019), available at: https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US

at 32). First, the Defendant does not have a burden to disprove all potential innocent explanations for a disparate impact. The Defendant must show that "the original enactment was motivated by a desire to discriminate," and it "continues to this day to have that effect." *Hunter*, 471 U.S. at 233. Second, blaming the disparate impact on a shared border with Mexico is an oversimplification considering Mexicans have made up less than half of the unauthorized immigrant population in America since 2017,[12] and considering Canada shares a larger border with the United States than Mexico.[13]

Further, the government relies on *Regents* to argue that "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration program." (ECF No. 25 at 32) citing *Regents*, 140 S. Ct. at 1915-16. It is true that 78% of DACA recipients are Latinos from Mexico and thus, were DACA to end, 78% of those affected would necessarily be Latinos from Mexico. *Id.* This logic is not applicable here. The illegal reentry law is not an immigration program that individuals from one race have opted into more frequently than another. This is a criminal statute that, on its face, should apply equally to all who enter or are found in the United States without authorization, after a prior deportation. *See* 8 U.S.C. § 1326. However, 99% of those convicted under the statute fit one racial category and that category is not 99% of the relevant group.

Finally, the government argues that "defendant in his motion makes no attempt to argue that the 1952 Congress was actually aware of any disparate impact associated with the then-existing reentry prohibition." (ECF No. 25 at 35). The Defendant is not required to prove that the 1952

---

[12] Jeffrey S. Passel and D'Vera Cohn, *Mexicans Decline to Less than Half the U.S. Unauthorized Immigrant Population for the First Time*, Pew Research, (June 12, 2019), available at: https://www.pewresearch.org/fact-tank/2019/06/12/us-unauthorized-immigrant-population-2017/
[13] "According to the U.S. Geological Survey, the length of the International Boundary line of the U.S. U.S.-Canadian border, excluding Alaska, is approximately 3,987 miles, while the length of the U.S.-Mexican border is estimated at 1,933 miles." Janice Cheryl Beaver, *U.S. International Borders*, Congressional Research Service of The Library of Congress, (2007).

Congress was actually aware of a disparate impact. However, Congress certainly was aware. *See* S. Rep. 81-1515 at 630 ("the largest number of persons who as aliens are deported twice, are deported to Mexico."); *Id.* at 149-152 (providing statistics on Mexican and Latin American immigration); In sum, the Defendant has met his burden to show that the illegal reentry law bears more heavily on Mexican and Latinx individuals.

## IV. The Government Failed to Demonstrate that the Legislature Would Have Enacted the Law Without Discriminatory Intent

Because Mr. Calvillo-Diaz has met his burden, the burden now shifts to the government to show that Congress would have enacted the illegal reentry law "even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270, n.21. The government argues that the law would have been passed for two reasons: (1) Section 1326 was passed after a thorough investigation of the immigration system, and (2) Section 1326 has been amended. Neither demonstrate that illegal reentry would have been criminalized without a discriminatory motive.

First, the fact that the Act within which the law is located was passed after an investigation of the immigration system of the United States does not foreclose the possibility that provisions of the Act were included for discriminatory purposes. Indeed, the "intensive and searching investigation," nonetheless upheld a quota system based on race. (ECF No. 25 at 36). This investigation failed to rid the Act of its discriminatory motives, especially considering that it was not until 1965 that the law prohibited discrimination "in the issuance of an immigration visa because of the person's race, sex, nationality, place or birth, or place of residence." Pub. L. No. 89-236, 79 Stat. 911 (1965) (codified as amended at 8 U.S.C. §1152(a)(1)(A)). The fact that the law has been made more punitive through minor amendments is likewise not an indication that Congress would have criminalized illegal reentry without a discriminatory intent.

The statute challenged here is specifically the criminalization of illegal reentry. The government may be correct that Congress would have generally passed immigration laws, but many other

deportation provisions do not attach criminal penalties. The government has not demonstrated that Congress would have enacted the statute that created a criminal penalty for illegal reentry without a discriminatory motive. The Defendant has presented considerable evidence suggesting that Congress, both in 1929, and in 1952, was motivated in part by discriminatory intent. Mr. Calvillo-Diaz has met his burden under *Arlington Heights* and thus, his motion should be granted. However, should the Court find that more is needed, an evidentiary hearing, as opposed to an outright denial, would be warranted.

## CONCLUSION

For these reasons and those raised in the Defendant's original motion, the Defendant, Nicolas Calvillo-Diaz, respectfully requests that the Court grant his Motion to Dismiss the Indictment or in the alternative, schedule an evidentiary hearing to determine the issues raised herein.

Respectfully submitted,

*/s/ Nishay K. Sanan*
nsanan@aol.com

Respectfully submitted,

*/s/ Cece White*
cece@sananlaw.com

Nishay K. Sanan, Esq.
53 W. Jackson Blvd., Suite 1424
Chicago, Illinois 60604
Tel: 312-692-0360
Fax: 312-957-0111