**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 21 CR 445 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| NICOLAS CALVILLO-DIAZ, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Defendant Nicolas Calvillo-Diaz, charged with one count of illegal reentry in violation of 8 U.S.C. § 1326, seeks dismissal of the indictment on the grounds that this statute violates the Fifth Amendment Equal Protection Clause of the U.S. Constitution under the standard articulated in *Village in Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). He argues that the predecessor statute of § 1326, the Unauthorized Aliens Act of 1929 (UAA), was motivated by racial animus towards people of Latin American descent, and that racial animosity continues to taint application of the present unlawful reentry statute. The UAA's unlawful reentry provision, however, was reenacted and recodified without debate as § 1326 in 1952 as part of a comprehensive overhaul of the immigration laws. It was then amended several times throughout the 1980's and 1990's. Calvillo-Diaz argues that the history behind the 1929 law, along with some evidence of racial animus from 1952, shows that a discriminatory purpose motivated Congress's reenactment of the law in 1952. The government responds that the motives of Congress in 1929 cannot be imputed to Congress in 1952, and that Calvillo-Diaz's other evidence of racial animus is insufficient to show a discriminatory purpose. Under Supreme Court precedent, this history behind the 1929 law is relevant, but far from dispositive, and the Court concludes that the

defendant has not adduced sufficient evidence of discriminatory intent to overcome the presumption of legislative good faith as to subsequent enactments and amendments. The motion is accordingly denied.

## BACKGROUND

Defendant Nicolas Calvillo-Diaz, a citizen of Mexico, has been removed from the United States twice before, with a previous conviction for violating 8 U.S.C. § 1326. He was first removed in 1998 after convictions for armed robbery and unlawful weapons possession. He had returned to the United States unlawfully by 2009, when he was arrested for aggravated discharge of a firearm and was prosecuted for both unlawful reentry and the aggravated discharge offense. After serving the sentences for those convictions. Calvillo was removed again in October 2016. He had reentered unlawfully again at some point before July 16, 2021, when Immigration and Customs Enforcement (ICE) took Calvillo-Diaz into custody. A grand jury returned an indictment against him on August 17, 2021, for violating § 1326 and 6 U.S.C. § 202(4). Because he has been previously convicted of various felonies in the United States, the government is charging him under § 1326(b)(2).

Section 1326(b)(2) imposes penalties on noncitizens who have been removed from the United States and are subsequently "found in" the United States. Subsection (b) lists various circumstances that result in higher penalties, such as the illegal entry of a noncitizen (like Calvillo-Diaz) who has previous felony convictions in the United States. The statute was originally enacted in 1952, though its language then tracked almost word-for-word a portion of the 1929 UAA that criminalizes unauthorized reentry. Section 1326 was amended several times in the latter part of the twentieth century, in 1988, 1990, 1994, and 1996, in each instance to increase penalties or ease prosecution.

A district court in Nevada recently held that § 1326 violates the Fifth Amendment because it was enacted with a discriminatory purpose and accordingly dismissed an indictment brought

under the statute. *United States v. Carrillo-Lopez*, 555 F. Supp. 3d 996, 1027 (D. Nev. 2021). The government's appeal in that case is pending at the Ninth Circuit. Other courts that have considered the same arguments have uniformly rejected them.[1] Much of the defendant's argument is based on the court's opinion in *Carrillo-Lopez* and references evidence adduced in that matter.

## DISCUSSION

Calvillo-Diaz argues that § 1326 violates the equal protection clause of the Fifth Amendment because it has a disparate impact on noncitizens of Latin American descent and its enactment was motivated by racial animus. *See also Washington v. Davis*, 426 U.S. 229, 239 (1976). His claim relies on *Village of Arlington Heights,* a zoning case in which the Supreme Court confirmed that "where there is a proof that a discriminatory purpose has been a motivating factor in the decision" of a legislative or administrative body, judicial deference to the decision is unwarranted. 429 U.S. at 252 (1997). The Supreme Court set forth factors a court may consider in evaluating whether racism was a motivating factor behind legislative action, including the "historical background" of the legislature's decision, "departures from the normal procedural sequence," the "legislative and administrative history," and "contemporary statements by members

---

[1] This Court has not found any opinions that follow *Carrillo-Lopez* or that have otherwise sustained an equal protection challenge to the application of § 1326. Several courts have applied *Arlington Heights* but concluded that the defendant failed to prove the statute was enacted with a discriminatory purpose. *See United States v. Machic-Xiap*, 552 F. Supp. 2d 1055, 1074-76 (D. Or. 2021); *United States v. Hernandez-Lopez*, 2022 WL 313774 (S.D. Tex. 2022); *United States v. Munoz-De La O*, 2022 WL 508892 (E.D. Wash. 2022); *United States v. Wence*, 2021 WL 2463567 (D.V.I. 2021); *United States v. Sanchez-Felix*, 2021 WL 6125407 (D. Colo. 2022); *United States v. Gamez-Reyes*, 2022 WL 990717 (D. Colo. 2022). Others have applied rational basis review, citing the plenary power doctrine, and upheld the statute without an analysis under *Arlington Heights. See United States v. Novondo-Ceballos*, 554 F. Supp. 3d 1114, 11120-21 (D.N.M 2021); *United States v. Ruiz Rivera*, 2020 WL 5230519 (S.D. Cal. 2020); *United States v. Gutierrez-Barba*, 2021 WL 21388801 (D. Ariz. 2021); *United States v. Ramirez-Aleman*, 2022 WL 1271139 (S.D. Cal. 2022); *United States v. Porras,* 2022 WL 1444311, *3 (N.D. Ill. May 6, 2022).

of the decision-making body," among other evidence. *Id.* at 564-65. The party challenging a statute bears the burden of demonstrating that a racially discriminatory purpose was a motivating factor. *Id.* at 265-68. Once that burden is discharged, the government must show that the law would have been enacted regardless of any underlying discriminatory motive. *Id.* at 270 n.21. If Calvillo-Diaz can prove that the law was motivated by a discriminatory purpose, then it is subjected to strict scrutiny, *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999), but if he cannot, then the constitutional inquiry ends. *Arlington Heights*, 429 U.S. at 271.

To address the defendant's claim, the Court must first consider whether the *Arlington Heights* test applies in this case, or whether, as the government argues, Congress' plenary power in the immigration sphere constrains the Court to proceed directly to rational basis review. The Court concludes that *Arlington Heights* applies. Calvillo-Diaz, however, has not discharged his burden under *Arlington Heights* to show that animosity due to race or national origin was a motivating factor for the enactment of § 1326. There is substantial evidence that in enacting the "Undesirable Alien Act," the 1929 Congress was motivated by racism and xenophobia, but evidence that the same is true of the 1952 legislature is lacking. And even if Calvillo-Diaz had carried his burden with respect to the 1952 enactment, the statute's history in the 1980's and 1990's demonstrates that the law would have been enacted independently of any discriminatory intent.

## I. *Arlington Heights* Governs the Standard of Review

The government argues that, because this case arises in the immigration context, the Court should ask only whether § 1326 survives rational basis review without performing an analysis under *Arlington Heights*. A statute "survives rational basis scrutiny if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *City of Chicago v. Shalala*, 189 F.3d 598, 605 (7th Cir. 1999).

The principal authorities cited by the government in support of this proposition involve challenges to alienage classifications imposed by the federal government,[2] not racial classifications. Alienage classifications are indeed subject to rational basis review, and the defendant does not dispute that the government need only articulate a rational basis for such classifications. *See Mathews v. Diaz*, 426 U.S. 67, 81 (1976) (upholding Medicare-eligibility statute that restricted eligibility to permanent residents who had resided in this country for five years, reasoning that it was not "wholly irrational"); *Shalala*, 189 F.3d 598, 609 (7th Cir. 1999) (applying *Mathews v. Diaz* and reviewing Welfare Reform Act's restrictions on noncitizen eligibility under the rational basis standard.). Calvillo-Diaz does not challenge the constitutionality of § 1326 on the basis that it discriminates based on immigration status, but rather race and national origin, so these cases are inapposite.

Contrary to the government's assertion that rational basis review alone is appropriate for immigration laws, the Supreme Court has applied heightened scrutiny in immigration cases. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1688 (applying heightened scrutiny to gender-based classification for determining citizenship eligibility for those born abroad and holding it violated the equal protection guarantee of the Fifth Amendment); *Dep't of Homeland Security v. Regents*, 140 S. Ct. 1891, 1915-16 (2020) (applying *Arlington Heights* in challenge to DACA recission but holding that the plaintiff failed to state an equal protection claim).

Citing *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), the government argues that this is a special case in that it touches on national security. That case involved Presidential Proclamation 9645, which sought to "improve vetting procedures for foreign nationals traveling to the United States"

---

[2] Alienage classifications imposed by states are subject to heightened scrutiny. *Graham v. Richardson*, 403 U.S. 365, 371-72 (1971).

from certain countries, almost all of them majority-Muslim nations. The Supreme Court found deference necessary in that case to protect "the flexibility of the President to respond to changing world conditions." *Id.* at 2420 (citing *Mathews*, 426 U.S. at 81-82). Importantly, that case dealt with "the admission and exclusion of foreign nationals," the power over which the Court recognized as a "fundamental sovereign attribute" entrusted to the political branches. *Id.* at 2419. This case, by contrast, is about criminal prosecution of foreign nationals, and the government cannot seriously argue that noncitizens receive different constitutional protections than citizens in criminal proceedings. *See Wong Wing v. United States*, 163 U.S. 228, 237 (recognizing the government's plenary power in the areas of exclusion and deportation but distinguishing those areas from criminal punishment, holding that "even aliens shall not be held to answer for a capital or otherwise infamous crime… without due process of law."). Following the government's argument to its logical conclusion, so long as Congress provided some rational justification, it could strip noncitizens of, say, the right against self-incrimination, or otherwise set up a separate and diminished criminal procedure than that enjoyed by citizens. The Fifth Amendment's equal protection guarantee means that citizens and noncitizens alike enjoy the same protections in criminal proceedings and thus cannot be prosecuted under a statute that was motivated by a discriminatory purpose. "[T]he Due Process clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

The Court has little trouble concluding that the Fifth Amendment applies to § 1326, and that if this law were enacted with a racially discriminatory motive, it would be subject to heightened scrutiny. This approach accords with that of several other district courts that have considered this same challenge to § 1326. *See United States v. Munoz-De La O*, 2022 WL 508892

(E.D. Wash. 2022) (considering challenge to § 1326 under *Arlington Heights*, but denying motion to dismiss indictment); *United States v. Hernandez-Lopez*, --- F. Supp. 3d---, 2022 WL 313774 (S.D. Tex. 2022) (applying *Arlington Heights* without analyzing whether plenary power doctrine dictates rational basis review).

## II.    The Plaintiffs Have Failed to Discharge Their Burden Under *Arlington Heights*

### A.    Disproportionate Impact

Under *Arlington Heights*, a statute's disproportionate effect on a protected class "may provide an important starting point" in determining whether racial discrimination was a motivating factor behind its enactment. 429 U.S. at 267. The defense did not argue this point with statistical rigor, offering only a hodgepodge of inapt comparisons:

> In recent years, a high percentage of those apprehended at borders for illegal reentry have been of Mexican descent, including 97 percent in 200, 86 percent in 2005, and 87 percent in 2010.[3] From 1998 to 2018, federal arrests of non-U.S. citizens more than tripled, rising 234 percent while arrests of U.S. citizens rose only 10 percent over the same period.[4] 72 percent of all non-U.S. citizens arrested in 2018 for immigration offenses were Mexican citizens.[5] In 2018, the number of federal arrests of Mexican citizens exceed the number of federal arrests of U.S. Citizens. Specific to illegal reentry, in 2020, 99.1% of illegal reentry offenders were identified as Hispanic.[6]

MTD at 13-14, ECF No. 19.[7]

These statistics are largely meaningless because showing that "a high percentage of those apprehended at borders for illegal reentry have been of Mexican descent" would establish a

---

[3] U.S. Border Patrol, *Nationwide Apprehensions by Citizenship and Sector*, 2007-2019.

[4] U.S. Dept. of Justice, Bureau of Justice Statistics, *Immigration, Citizenship, and the Federal Justice System*, 1998-2018, 2 (Aug. 2019).

[5] *Id.* at 2.

[6] *Id.*

[7] Citing U.S. Border Patrol, Nationwide Apprehensions by Citizenship and Sector, 2007-2019; U.S. Dept. of Justice, Bureau of Justice Statistics, Immigration, Citizenship, and the Federal Justice System, 1998-2018, 2 (Aug. 2019).

disproportional impact on those of Mexican descent only if persons of Mexican descent did not also constitute a comparable percentage of the population of persons attempting to reenter unlawfully; if 87 percent of those attempting to reenter the United States in 2010 were of Mexican descent, the fact that 87 percent of unlawful reentry arrestees in 2010 were of Mexican descent would be perfectly proportional.[8] And, as the government argues (albeit also without statistical rigor), due to factors like geography and migration patterns, it is reasonable to infer that "Latinx individuals make up a disproportionately high percentage of those illegally in the United States." It is not, then, particularly probative of discriminatory animus to learn that people of Latin American descent make up a high percentage of those arrested for unlawful reentry. In *Regents*, a plurality of the Supreme Court made the same point, observing that "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program." *Regents,* 140 S. Ct. at 1916. The same is true of any immigration enforcement program.

In short, whether § 1326 has a disproportionate impact on those of Latin American descent must be measured by reference to what percentage of those eligible to be prosecuted under the statute (*i.e.*, those who have reentered the country unlawfully) are of Latin American descent, but

---

[8] The other statistical comparisons offered are similarly flawed. If 99.1% of illegal reentry offenders in 2020 were Hispanic, we can conclude that § 1326 had a disproportionate effect on Hispanics only if we know that Hispanic reentry offenders constituted a lower percentage of the total population of reentry offenders. That arrests of non-citizens increased by 234 % over a period of 20 years while arrests of citizens increased by only 10% tells us nothing about disproportionate impact unless accompanied by data that tells us how much the non-citizen population grew over that period; that statistic, moreover, does not differentiate between Latin Americans and other immigrant classes and factors in arrests for all crimes, not just unlawful reentry. Comparing the number of "federal arrests" of Mexican and United States citizens suffers from the same imprecision; the bulk of arrests of Mexican citizens likely occur at the border and do not result in prosecutions under § 1326. Comparing arrests of Mexicans to arrests of United States citizens, moreover, is specious; while immigration offenses likely make up the bulk of federal arrests of Mexican citizens, they likely constitute a far smaller percentage of arrests of United States citizens.

the defense has not provided that data. Absent such evidence, the Court cannot determine whether § 1326 has a disproportionate effect on individuals of Latin American descent. The simple fact that a high percentage of those arrested under § 1326 are of Latin American descent does not suffice to demonstrate that § 1326 was enacted with a racially discriminatory purpose, nor does it support Calvillo-Diaz's other evidence of Congress' allegedly discriminatory purpose.

Even were the statistics cited by the defense adequate to show that § 1326 has some disproportionate effect on people of Latin American descent, that lack of proportionality would not suffice, standing alone, to establish that the law is unconstitutionally discriminatory. The Supreme Court has not "embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional solely because it has a racially disproportionate impact." *Washington v. Davis*, 426 U.S. 229, 239 (1976). Regardless of discriminatory effect, the defense must also adduce evidence of discriminatory purpose. Here, too, Calvillo-Diaz falls short.

### B. Historical Background

In 1924, Congress enacted the National Origins Act, which established a quota system under which the number of visas given to a certain country's nationals was a percentage of the population of immigrants from that country currently in the United States. *See* Immigration Act of 1924, Pub. L. No. 68-139, ch. 190, 43 Stat. 153. As the Senate Judiciary Committee recognized in 1951, the purpose of the NOA's quota system was to "preserve the balance among the various elements in our white population." S. Rep. No. 81-1515 at 430.

The quota system, however, did not apply to nations in the Western Hemisphere. Nativists who favored restrictions like those in the National Origins Act were not the only force in Congress; opposing them were agribusiness interests that "relied on short-term Mexican labor." *United States v. Rios-Montano*, 2020 WL 7226441 *4 (S.D. Cal. Dec. 7, 2020) (analyzing illegal entry statute,

§ 1325, under *Arlington Heights* and concluding that defendant failed to prove it was enacted with a discriminatory purpose). The influence of agribusiness interests was sufficiently powerful to threaten the demise of the entire National Origins Act if the Western Hemisphere were not excluded from the quota system. MTD at 7 (citing *Carrillo-Lopez*, No. 20-CR-00026; Motion to Dismiss, Ex. A., Declaration of Kelly Lytle Hernández.). According to Calvillo-Diaz's account, by 1929, nativists in Congress reached a compromise with agribusiness interests by which Mexico would continue to be excluded from the quota system, but immigrants themselves would be criminalized and prosecuted once the seasonal need for labor had ended.[9] This compromise was reflected in the UAA, which criminalized illegal reentry. *See* Pub. L. No. 70-1018, ch. 690, 45 Stat. 1551 (1929).

The defendant has put forth the same evidence used in other cases to show that § 1326's predecessor was motivated by discriminatory animus, including that presented in *Carrillo-Lopez*, 2020 WL 241467, and the Court need not revisit it in full. Many district courts that have considered the issue have acknowledged the ugly history behind the 1929 law. *See United States v. Hernandez-Lopez*, 2022 WL 313774 * 2 (gathering cases). Suffice it to say that the history of the 1929 enactment reflects a shameful chapter in America's past, one in which Congress considered "The Eugenical Aspects of Deportation"[10] and in which members of Congress decried that Mexicans were "poisoning the American citizen… from a moral standpoint," and referred to

---

[9] MTD at 7-8. The defense cites an article from ProPublica: Ian MacDougall, Behind the Criminal Immigration Law: Eugenics and White Supremacy, PROPUBLICA (June 19, 2020), available at: [https://www.propublica.org/article/behind-the-criminal-immigration-law-eugenics-and-white-supremacy]. The article features a detailed historical account and contains quotations from lawmakers at the time, but without citation. The Court is thus reluctant to rely on this article. These particular historical details are not necessary to its conclusion regarding the 1929 law's discriminatory purpose.

[10] *The Eugenical Aspects of Deportation: Hearings Before the Committee on Immigration and Naturalization House of Representative*, 70th Cong. 70.1.4, pp. 2-3 (1928).

migrants as "Mexican peons" whose blood was mixed with "low-grade Indians."[11] Racism "permeated the official congressional debate," *Machic-Xiap*, 552 F. Supp. 3d. at 1061, and the Court acknowledges that other district courts have had little trouble ascribing discriminatory intent to Congress with respect to the 1929 UAA. *See Hernandez-Lopez*, 2022 WL 313774 *2 (gathering cases and observing that "[a]ll have acknowledged the racial animus behind the 1929 law."). The government does not dispute this; it gestures towards an argument that the defendant cannot demonstrate the intent of Congress in 1929 but assumes for the sake of argument that it was motivated by a discriminatory purpose. Gov't Resp. at 6-7. In the absence of a developed argument to the contrary, the Court will assume, *arguendo*, that Congress enacted the 1929 UAA with a discriminatory purpose.[12]

The parties dispute the relevance of this history for determining whether later enactments and amendments to the statute were similarly infected by racial animus. The defendant says it is practically dispositive—"there is nothing to suggest that [§ 1326] is free of its original motivations." Reply at 11, ECF No. 29. The government contends the UAA has no relevance; only the motivations of a particular Congress passing a reenactment or amendment matter. Indeed, Congress enjoys a "presumption of legislative good faith" which is "not changed by a finding of

---

[11] Statement of Rep. Box (TX), "Restriction of Mexican Immigration," 69 Cong. Rec. 2817 (Feb. 9, 1928); Statement of Rep. Fitzgerald 70 Cong. Rec. 3619 (1929).

[12] This is not to say that the defendant has proven that the entire deliberative body (as opposed to some of its members) was motivated by racism in 1929. Proving that the U.S. Congress was motivated by discrimination is a tall order—significantly more difficult than establishing the discriminatory intent of the seven-member zoning board whose action was challenged in *Arlington Heights*, which, in any event, the plaintiff in that case failed to do. 429 U.S. at 560. That racist and xenophobic attitudes were frequently expressed in debate does not necessarily mean that these attitudes were a motivating factor for the majority of legislators who voted for the law—it could well be that many supported the law for race-neutral reasons. However, because Calvillo-Diaz's evidence of discriminatory purpose for the later enactment of § 1326 is so deficient, Congress's intent in 1929 ultimately matters little.

past discrimination, which is but one evidentiary source." *Abbott v. Perez*, 138 S. Ct. 2305 (2018). Evidence of past discrimination is relevant, but "cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *See City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980). If past racism is remote in time, then it will have less probative value. *McCleskey v. Kemp*, 481 U.S. 279, 289 n.20 (1987).

The Supreme Court has emphasized that evidence of past discrimination must not result in courts flipping the *Arlington Heights* burden onto the legislature. In *Abbott v. Perez*, plaintiffs challenged Texas's 2011 congressional redistricting plan alleging that several districts were the product of racial gerrymandering. 138 S. Ct. at 2315. After a Texas district court drew up interim plans for use in fast-approaching midterm elections, Texas sought relief from that order in the Supreme Court, which reversed and remanded with instructions that the district court should use the 2011 plans as a starting point and adjust it to ensure compliance with the Constitution and the Voting Rights Act. *Id.* at 2316. The District Court drew up new interim plans, and the 2013 Texas legislature then repealed the 2011 plans and adopted the District Court's interim plans "with minor changes." *Id.* at 2317. Texas held its 2014 and 2016 elections pursuant to these plans. Meanwhile, the District Court held that the challenge to the 2011 plans was still live, reaffirming and elaborating upon its earlier conclusion that the 2011 plans contained impermissible racial gerrymanders. *Id.* at 2317. In August 2017, the district court turned its attention to the 2013 plans that had been used in the 2014 and 2016 elections, and held several districts unlawful, reasoning that there was "no indication that the legislature looked to see whether any discriminatory taint [from the 2011 plans] remained in the 2013 plans." The Supreme Court held that the District Court erred in that it "disregarded the presumption of legislative good faith" and "improperly reversed the burden of proof" by requiring the Texas legislature to "purge its predecessor's allegedly

discriminatory intent." *Id.* at 2326-27. Its holding in favor of Texas was primarily based on the fact that the district court had flipped the burden on the State.

The defense emphasizes the obvious factual distinctions—the Court placed little significance on any discriminatory purpose animating the 2011 legislature because the 2013 legislature had made significant alterations based on the district court's approved plans. Section 1326 is different, Calvillo-Diaz argues, because there were no substantive changes between it and its 1929 predecessor statute, other than increased penalties and changes that made the offense simpler to prosecute. MTD at 9. The Court acknowledges the distinction, but concludes it does not alter the force of *Abbott's* holding: the Supreme Court put to rest the idea that a subsequent legislature must "engage in deliberation" regarding past racism in order to cure its "taint" or else have the past's legislature's discriminatory animus imputed to the contemporary one. *Abbott*, 138 S. Ct. at 2325.

Calvillo-Diaz has some helpful dicta in his column. In *Hunter v. Underwood*, for example, the Supreme Court sustained an *Arlington Heights* challenge against Section 182 of the Alabama constitution, which disenfranchised people who had committed any offense on a list of enumerated minor crimes. Evidence of the motivations of Alabama's constitutional convention—including "the proceedings of the convention, several historical studies, and the testimonies of two experts"—demonstrated conclusively that § 182 was enacted to disenfranchise Black voters. Alabama argued that the facially-neutral statute had been legitimated by "events occurring in the succeeding 80 years," including that some of the enumerated offenses—including miscegenation—had been struck down by the courts. *Id.* at 233. "Without deciding whether § 182 would be valid if enacted today without any impermissible motivation, we simply observe that its original enactment was motivated by a desire to discriminate against blacks on account of race and

the section continues to this day to have that effect," and thus violates equal protection. *Id.* This is the defendant's strongest authority, though Section 1326, unlike Alabama's Section 182, has been reenacted, so this case presents exactly the scenario that the Supreme Court declined to reach in *Hunter*. The defendant's other authorities do not alter the analysis, they are similarly dicta.[13]

With these principles in mind, the Court examines the evidence put forth by the defendant to establish that the 81st Congress that enacted § 1326 in 1952—mostly a repeat, often with direct citations to, the record developed in *Carrillo-Lopez*—cognizant that the 1929 illegal reentry provision was enacted against a backdrop of substantial racial animus against Mexicans and others of Latin American descent.

### C. The defendant's evidence of a discriminatory motive underlying the enactment of § 1326 in 1952 is insufficient.

Calvillo-Diaz's argument ultimately relies on drawing a strong inference from the 81st Congress's silence regarding the racism behind the UAA: "The fact that Congress was silent in the face of this knowledge does support an inference 'that invidious discriminatory purpose' was at least one motivating factor." Reply at 17. The record regarding the enactment of § 1326 in 1952 does not mention the racism that tainted the enactment of the 1929 illegal reentry statute. That silence, Calvillo-Diaz argues, is evidence that the 1952 Congress shared the animus of the 1929 Congress toward Mexicans and other Latin Americans.

---

[13] For example, the defense argues that the Supreme Court in *Ramos v. Louisiana* "invalidated state laws permitting nonunanimous verdicts because race was a motivating factor when they were adopted despite the laws having been since been amended. Reply at 11 (citing 140 S. Ct. 1390, 1394 (2020)). True, the *Ramos* court discussed, and was disturbed by, the racist motivations underlying Louisiana's allowance of non-unanimous jury verdicts—to satisfy the requirement to allow for Black jurors while ensuring that their voices would be nullified. But the Supreme Court ultimately held that a law permitting non-unanimous juries is unconstitutional on its face as a violation of the Sixth Amendment, regardless of the legislature's motives: "a jurisdiction adopting a nonunanimous jury rule even for benign reasons would still violate the Sixth Amendment." 140 S. Ct. at 1401 n.44.

For example, Calvillo-Diaz points to a comprehensive Judiciary Committee Report from 1950, "The Immigration and Naturalization Systems of the United States," arguing that the commissioning of this in-depth, 925-page study belies the notion that Congress could have overlooked the racist history of criminalizing illegal reentry, especially because that report recognized the law had a disparate impact on Mexican nationals. Reply at 6, 9, (citing S. Rep. No. 81-1515 at 655). Silence itself does not prove discriminatory intent, Calvillo-Diaz concedes, but it is implausible that a Congress that was "tasked with reforming immigration policies that were openly adopted to control the racial composition of the population" would be unaware of the racist history behind § 1326's predecessor. It is also naïve to believe that the 81st Congress, armed with this report and aware of its observation that "The largest number of persons, who are [noncitizens] who are deported twice are deported to Mexico," could have simply missed the ugly history of the 1920's. S. Rep. No. 81-1515 at 364-65.

But this report, far from raising a strong inference from silence that Congress acted out of invidious discrimination, better supports an inference that Congress based its decision on legitimate concerns about securing the border from unauthorized entry from all directions. Congress was concerned about illegal entry through Canada, too—*See* Sen. Rep. No. 81-1515, 634-635 ("It was represented to the subcommittee, however, that the skeleton border patrol covering 4,000 miles of wide open Canadian border will be confronted in the immediate future by Europeans arriving in Canada who will seek to effect illegal entry into the United States."). The report, while noting that Mexican nationals comprised over 90% of apprehensions, theorized that the difference had to do with differences in the countries' economies—for now, it said Canada's "fairly good economy" kept its number of illegal entrants low, but it observed that apprehensions were increasing and expressed anxiety about wide-open swathes of border. Could this have been

pretextual padding of the legislative record? Anything is possible—but there is no evidence that it was, and the Court must presume that the 81st Congress analyzed the issue in good faith.

The defense also points to passages in this report that suggest animus towards Mexicans and people of Latin-American descent in general. Reply at 21-22, ECF No. 29. The Court acknowledges that many of these passages describe racist attitudes and detail the views of nativists who sought immigration policies that would promote white supremacy. But these comments in a Senate Report fail to show that a discriminatory purpose underlay the 1952 reenactment of § 1326 for two reasons: First, they do not relate to the criminalization of unauthorized entry or reentry, but to the quota system and the debate over whether to impose quotas on Western Hemisphere nations. Second, these passages are, in most cases, descriptions of nativist positions meant to inform Senators of opposing views on the subject, without necessarily endorsing the nativist view. Take one passage about the quota system that is particularly damning when quoted out of context:

> It was stated that as a result of the nonquota policy for natives of Western Hemisphere countries, an increasing number of aliens are entering from Mexico and Central America who live barely above, or even below, the subsistence level and who are content to live on their earnings during summer months and public relief the rest of the year…. It was also stated that these aliens have shown little capacity for self-government, have seldom applied for citizenship, and generally cannot be depended upon to support wholeheartedly our democratic institutions. As a matter of self-protection, it was argued, these aliens should be placed under some numerical restriction.

*Id.* at 473. The next paragraph begins by referring to this position as "agitation for restriction" that has ebbed and flowed with migration numbers and economic factors. *Id.* The report then turns to describing the opposing arguments in support of excepting Western Hemisphere nations from the quota system, and in conclusion, recommends that Congress retain the Western Hemisphere exception from the quota system. *Id.* at 473-74. Thus, all these passages tell us is that someone— it's not even clear that it was a Senator—expressed racist attitudes about immigrants of Latin

American descent, and that the committee report ultimately did not endorse the preferred policy of those nativists: the imposition of quotas on the Western Hemisphere. The selective quotation of this passage demonstrates the danger of ascribing intent to a legislature based on isolated remarks, and the hazards of trying to divine a legislative purpose based on views expressed to Senators engaged in fact-finding.

The defendant concedes that the record regarding the enactment of § 1326 in 1952 does not mention the racism behind the 1929 illegal reentry statute. In trying to fill that silence with discriminatory intent, the defendant brings a few additional pieces of evidence. Those consist of 1) a related piece of anti-harboring legislation that the defendant says was nicknamed "the wetback bill," 2) A letter from Attorney General Ford to Congress that included the same slur and advocated for amendments that would ease prosecutions, and 3) President Truman's veto (later overridden) of the 1952 McCarran-Walter Act. The Court finds the first two to be weak and the third to be entirely inapposite.

Senate Bill 1851, or what the defendant calls the "Wetback Bill," was a piece of anti-harboring legislation, which, in the defendant's telling, included penalties only for undocumented workers and not their employers. MTD at 11, ECF No. 19. This law, then, reflected the same compromise between nativists and agribusiness interests that underlay the 1929 illegal entry law. The government responds that this is a separate piece of legislation entirely, and that while it was passed by the same Congress, it was passed months before § 1326 and is thus irrelevant to the discussion about the illegal reentry statute. In the Court's view, if it were true that a law closely related to the subject matter of § 1326—deterring and punishing unauthorized migrants—was

openly debated using racist epithets,[14] then such legislative action would provide evidence of discriminatory animus that could explain why § 1326 was reenacted without much discussion. But Calvillo-Diaz has not actually shown that the bill was "nicknamed" with a racist epithet or that the term featured prominently in debates. The defense cites to two sources for this claim—Judge Du's opinion from the proceedings in the District of Nevada, and a work of historical scholarship[15] about "Operation Wetback"—a Border Patrol campaign of mass deportation that extended throughout the 1940's and 50's. There is no pinpoint citation to that article provided for the defense's specific claim about Senate Bill 1851 and the Court's review revealed no mention of the bill, much less detailed coverage of the debates. Moreover, the Court cannot impute any institutional racism on the part of the Border Patrol during this period to the 81st Congress, not least because the defense has provided no basis for the Court do so. As far as the Court can tell, the defendant identifies one Senator (McFarland, of Arizona) as using the epithet, and no one else. The notion that one senator's stray remark can ascribe racist intent to a whole deliberative body has been rejected by the Supreme Court. *See, e.g., U.S. v. O'Brien*, 391 U.S. 367, 383-84 (1968) (explaining that voiding a statute based on isolated statements is hazardous because "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it[.]"); *Weinberger v. Rossi*, 456 U.S. 25, 35 (1982) ("one isolated remark by a single Senator… is insufficient to establish" congressional intent).

---

[14] The government argues that "wetback" was an inoffensive term deployed to accurately describe a common method for crossing the border—via the Rio Grande—and thus it was not "intentionally derogatory." Resp. at 24 n.7. This argument is unpersuasive. "[R]educing an entire population to a fleeting condition of a subset of that population is precisely what makes the term a slur." *Machic-Xiap*, 552 F. Supp. 3d at 1074. It is not difficult to find examples of other slurs that are based in stereotypes thought not to be "intentionally derogatory."

[15] See generally Kelly Lytle Hernández, The Crimes and Consequences of Illegal Immigration: A Cross-Border Examination of Operation Wetback, 1943 to 1954." 4 WESTERN HISTORICAL QUARTERLY 37, (2006).

The defense next argues that Senate Bill 1851 reflects a compromise handing victory to employers (who could hire undocumented labor without fear of punishment) and defeat to workers of Latin American descent (who would face additional punishment under SB 1851) and that this balance (mirroring that of the 1929 UAA) demonstrates that racial animus was a motivating factor. But even if this anti-harboring provision represents a victory for employers over an overwhelmingly Latin American group of workers, that itself does not show discriminatory purpose. The defense still must show that one interest group's victory over another was the result of a racially discriminatory purpose, and their best evidence of that was rejected in the preceding paragraph. Nor does the defense address the fact that § 1326 now coexists with stringent requirements on employers, complete with criminal penalties. *See* 8 U.S.C. § 1324a (criminalizing the knowing hiring of unauthorized immigrants and requiring that employers verify employees' work authorization).

Calvillo-Diaz also offers a letter from then-Attorney General Ford to Congress, dated May 14, 1951. Ex. A to Govt's Resp, ECF No. 25-1. The letter contains the Attorney General's commentary, solicited by Congress, on proposed changes to the immigration laws. The defense contends this letter evinces Congress's discriminatory motive in reenacting § 1326 because Ford recommended that Congress alter the law to allow prosecution of any noncitizen who was "found in" the United States without requiring proof of where he crossed the border—a change meant to ease prosecution by simplifying the identification of an appropriate venue. The government points out that Ford did not suggest this language, he described and commented on Congress's addition of this language to the illegal reentry law. Ex. A to Resp., ECF No. 25-1 at 437. Ford goes on to suggest clarifications to those noncitizens who are excepted from the statute which, if anything, broaden the exception to include not only those who have been "lawfully admitted" but those

whom the Attorney General has deemed eligible for lawful admission. Congress's motive was clearly to make the offense easier to prosecute, but Ford's letter sheds no light on any other motive, much less an invidious one. As for the use of the term "wetback," the government clarifies that it is used in a block quotation about a provision unrelated to § 1326. What's more, the epithet appears in an excerpt from an executive branch report, which tells the reader little about Congress's motives. The Ford letter does not close the gap.

Finally, Calvillo-Diaz contends that President Truman's statement accompanying his veto of the INA of 1952 shows that critics of the bill understood the racist policy underlying § 1326. But President Truman didn't mention § 1326; instead, his objection had to do with the retention of the quota system, so the veto statement does nothing for the defendant's argument.[16] *See Machic-Xiap*, 552 F. Supp. 3d. at 1075. The government also points out that a competing version of the bill put forward by Senators who agreed with President Truman that the quota system reflected xenophobic views contained an illegal reentry provision identical to the one ultimately enacted. Resp. 22, ECF No. 25 (citing S. 2842 § 276, 82d Cong., 2d Sess. (Mar. 12, 1952)). President Truman's veto, therefore, does not demonstrate that Congress enacted § 1326 due to a discriminatory motive. Rather, this episode helps to demonstrate that § 1326 would have been enacted even if Congress's motives were pure.

The defense has not carried its burden to show that § 1326 was enacted with a discriminatory purpose. Calvillo-Diaz does not point to any awareness on the part of the 81st Congress of the history behind the original 1929 criminalization of illegal reentry. It makes much

---

[16] *Veto of Bill to Revise the Laws Relating to Immigration, Naturalization and Nationality*, AM. PRESIDENCY PROJECT (June 25, 1952), *available at* https://www.presidency.ucsb.edu/documents/veto-bill-revise-the-laws-relating-immigrationnaturalization-and-nationality.

of that silence, but that silence has no probative value for determining the intentions of a deliberative body like Congress. The evidence the defendant uses to try to fill that silence is suggestive, but far from conclusive, and falls well short of overcoming the presumption that Congress acted in good faith.

### D. Amendments in the latter part of the twentieth century demonstrate that the illegal reentry statute would have been adopted regardless of its 1929 roots.

Even if Calvillo-Diaz were able to show that the 81st Congress's enactment of § 1326 was motivated by a discriminatory purpose, the government can show that the law would have been enacted free of that purpose. The law has been amended several times since 1952—in 1988, 1990, 1994, 1996, and 1997—in each instance, to add penalties or to ease prosecution and with nary a word suggesting discriminatory animus to those of Latin American descent. *See Carrillo-Lopez*, 555 F. Supp. at 1004 n.9-11. In the absence of any argument from the defendant regarding a discriminatory purpose underlying these later amendments, the government can show that the law would have been enacted notwithstanding the racial animus of the 1920's.

That the law was made more punitive during these years, free of any discussion that indicates an invidious motive, suggests that Congress's concern was deterring unauthorized migration, inarguably a constitutionally legitimate motivation. Moreover, these amendments came decades after the 1965 adoption of the current Immigration and Nationality Act, which abolished the quota system and forbade discrimination on the basis of "race, sex, nationality, place of birth, or place of residence[.]"[17] It is just as plausible that Congress, instead of deliberately ignoring the discriminatory animus underlying the 1929 criminalization of illegal entry or disingenuously

---

[17] *See* Pub. L. No. 89-236, 79 Stat. 911 (1965)

papering over it, was aware of that history and nonetheless thought that retaining § 1326 and stiffening its penalties was consistent with the objectives of the 1965 INA.

*    *    *

Calvillo-Diaz's motion to dismiss the indictment is denied. Additionally, the Court sees no need to hold an evidentiary hearing. *See* Reply at 26-27 (requesting a hearing). The defense has relied on the same arguments as those used by the court in *United States v. Carrillo-Lopez*, and has cited evidentiary materials used in that matter and others. *See, e.g.*, MTD at 7 n.17 (citing affidavit filed in *Carrillo-Lopez* as well as background facts provided in *United States v. Rios-Montano*, 2020 WL 7226441 *4 (S.D. Cal. Dec. 7, 2020)). Nor have the defendants discussed what testimony they would offer, or how that evidence would differ from that presented in the many cases in which defendants have lost identical motions. There is no reason for the Court to believe that an evidentiary would achieve anything beyond prolonging these proceedings.

Date: May 20, 2022

John J. Tharp, Jr.
United States District Judge